Peter G. HOLMSTROM, Plaintiff,

v.

COASTAL INDUSTRIES, INC., et al., Defendants.

No. C80–670A.

United States District Court,
N.D. Ohio, E.D.

March 6, 1984.

On Motion for Summary Judgment
Nov. 29, 1984.

On Motion to Withdraw Jury Demand
Oct. 23, 1986.

Marvin L. Karp, Cleveland, Ohio, Robert B. Block, Pomerantz, Levy, Haudek & Block, New York City, for plaintiff.

Steven E. Sigalow, Joseph C. Weinstein, Buckingham, Doolittle & Burroughs, John M. Glenn, Akron, Ohio, for Reid, Champion Investments and Cascade Industries.

Tom Parker, Richard E. Guster, Roetzel & Andress, Akron, Ohio, for Coastal Industries.

Oscar A. Hunsicker, Brouse & McDowell, Akron, Ohio, for Predler and Forty-Four Forty, Inc.

Hugh M. Stanley, Jr., Arter & Hadden, Cleveland, Ohio, for Ryder, Kelley, Nelson, Siff and Reese.

Robert A. Downing, Sudley & Austin, Chicago, Ill., for Harbor Ins. Co.

MEMORANDUM OPINION

DOWD, District Judge.

By this action the plaintiff prosecutes a derivative shareholder's action against a number of the directors of Coastal Industries, Inc. on behalf of Coastal Industries.

At issue is the motion for summary judgment filed by Coastal Industries, Inc.,

whereby the plaintiff's complaint would be dismissed. For the reasons which follow, the motion for summary judgment is denied.

The motion for summary judgment prosecuted by the nominal defendant Coastal Industries, Inc. is predicated upon the report of the Litigation Oversight Committee appointed by the Board of Directors of Coastal Industries following the commencement of this action by the plaintiff.

The plaintiff's complaint focuses upon the majority decision of a divided Board of Directors of Coastal Industries to purchase a substantial portion of its own stock at approximately 100% premium. The stock purchased was held by a subsidiary of Coastal Industries, Cascade Industries, Inc., which, as alleged by the plaintiff, was threatening to take control of Coastal's Board.

According to the position of the plaintiff, the purchase of Cascade Industries stock at the 100% premium had a two fold purpose, first to perpetuate the control by Coastal's management and secondly to serve the interest of defendant director James Pedler, now deceased, who, at the time of the purchase, was a major Coastal shareholder, and who had previously guaranteed a Cascade loan which was in default. The proceeds realized by Cascade from the purchase by Coastal of its stock were used by Cascade to pay off the loan personally guaranteed by Pedler. Hence, Pedler received a benefit by the transaction and, according to the plaintiff, was motivated by that self interest to vote for the challenged transaction.

The purchase of the shares of Coastal, held by Cascade, was approved by a minority of the Board of Directors, consisting of nine directors. The action to purchase the stock was approved by four members of the Board, two members of the Board voted no and two abstained. The ninth member was absent. Following the commence-

ment of the lawsuit, new members were elected to the Board of Directors. Those members, i.e., J. Robert Wilson, Robert J. Himelright, Jr., and Morris B. Jobe,[1] were designated to serve as the Litigation Oversight Committee (LOC) to review the question of whether it was in the best interest of Coastal Industries to have plaintiff's litigation pursued or terminated.

■ The concept of the litigation oversight committee flows from the business judgment rule which, in short, constitutes judicial recognition of the fact that a private corporation should, generally speaking, have the right to control its destiny respecting the prosecution of claims held by the corporation.

The LOC hired independent counsel, then conducted an investigation and concluded that it was in the best interests of Coastal Industries, Inc., to terminate the instant litigation. Hence, the motion of the defendant, Coastal Industries, Inc., for summary judgment.

Nearly every analysis of the application of the business judgment rule in the context of derivative suits by corporate shareholders begins with reference to the decision in *United Copper Securities Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 37 S.Ct. 509, 61 L.Ed. 1119 (1917), where Justice Brandeis, in considering the question of whether the business judgement rule could be employed to insulate the conclusions of management regarding corporate prosecution of a derivative suit from judicial scrutiny declared:

> Whether or not a corporation shall seek to enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management and is left to the discretion of the directors, in the absence of instruction by vote of the stockholders. Courts interfere seldom to control such discretion *intra vires* the corporation, except where the directors are guilty of

---

**1.** J. Robert Wilson is a former President and Vice-Chairman of Roadway Express, Inc.; he is currently the director of First National Bank of Akron. Robert J. Himelright, Jr. is President of

Teledyne Monarch Rubber Company. Morris B. Jobe is retired President of the Goodyear Aerospace Corporation.

misconduct equivalent to a breach of trust, or where they stand in a dual relation which prevents an unprejudiced exercise of judgment.

With the proliferation of shareholder derivative actions, the use and reliance upon the litigation oversight committee composed of independent directors has developed. Frequently, the courts have granted the dismissal of derivative shareholders' lawsuits when the independent or disinterested directors have recommended against a continuation of the litigation brought by the derivative shareholder, e.g. *Burks v. Lasker,* 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979); *Clark v. Lomas and Nettleton Financial Corp.,* 625 F.2d 49 (5th Cir.1980); *Lewis v. Anderson,* 615 F.2d 778 (9th Cir.1979); *Abbey v. Control Data Corp.,* 603 F.2d 724 (8th Cir.1979); *Genzer v. Cunningham,* 498 F.Supp. 682 (E.D.Mich.1980); *Maldonado v. Flynn,* 485 F.Supp. 274 (S.D.N.Y.1980); *Rosengarten v. International Telephone Telegraph Corp.,* 466 F.Supp. 817 (S.D.N.Y.1979).

As an additional application of the business judgment rule in the setting of a recommendation to dismiss made by a litigation oversight committee composed of independent directors, the courts have chosen to abide by the recommendation of the special litigation committee that the action be dismissed when the committee is composed of independent or disinterested directors and their recommendation is the product of a good faith and a thorough study of the issues regarding it is in the best interest of the corporation to pursue or to terminate the litigation. A component of the traditional view has been that the court should not assess independently the merits of the derivative suit as to do so would defeat the purpose of the business judgment rule which is premised on the expertise of the directors to render important business decisions without interference by the courts or shareholders. *See Joy v. North,* 519 F.Supp. 1312 (Conn.1981).

However, in recent years, some courts have begun to draw back from the traditional view and have begun to re-examine the idea that the judgment of the litigation oversight committee should prevail as long as it is comprised of disinterested directors and their recommendation has been reached as the result of a good faith, thorough effort in examining the issues from the perspective of the best interests of the corporation. The decision of the Delaware Supreme Court in *Zapata Corp. v. Maldonado,* 430 A.2d 779, (Del.S.Ct.1981), signaled the re-examination of the traditional view. The decision of the *Zapata* court is designed to steer a middle course between those decisions which yield to the independent judgment of a board committee and those which permit unbridled plaintiff stock-holder control over derivative actions. In steering the so-called middle course, the *Zapata* court decision is premised on the judicial declaration that the Court should apply its own business judgment in determining whether a motion for summary judgment should be granted because of a committee decision. In effect, the *Zapata* court decision calls for independent judicial review of the merits of the independent litigation committee's decision and requires a judicial assessment of: 1) the procedural propriety of a complaining shareholder's initiation of suit, 2) whether the board committee is endowed with the requisite corporate power to seek the dismissal of the derivative suit, 3) whether the movants have adequately demonstrated the disinterest, independence and good faith of committee members, the basis' for the conclusions of such members, and the appropriateness and sufficiency of their investigative techniques, and 4) whether in the court's view, exercising its own independent business judgment, dismissal of the derivative action is warranted.

Ohio Courts have long recognized the business judgment rule. *Wadsworth v. Davis,* 13 Ohio St. 123 (1862); *Goff v. Emde,* 32 Ohio App. 216, 167 N.E. 699 (1928); *McDonald v. Medical Mutual of Cleveland,* 41 Ohio Misc. 158, 324 N.E.2d 785 (1974); *Rice v. Wheeling Dollar Savings and Trust Co.,* 71 Ohio Law Ab. 205, 130 N.E.2d 442 (1954), *aff'd in part and rev'd in part on other grounds,* 163 Ohio

St. 606, 128 N.E.2d 16 (1955); *Gruber v. Chesapeake & Ohio Ry. Co.*, 158 F.Supp. 593 (N.D. Ohio 1957). However, no reported Ohio decision addresses the nature of the scrutiny a court should give to a recommendation of a litigation oversight committee which recommends that the corporation move to dismiss a derivative shareholder's action which is directed to claims of corporate directors' mismanagement or self dealing to the alleged detriment of the best interests of the shareholders.

Ohio courts have held that the corporation's directors should decide questions of corporate policy as long as they are not acting ultra vires and they had no involvement in the acts which form the basis of the complaint. *Rice, supra,* 71 Ohio Law Ab. at 211–13, 130 N.E.2d 442. "In the absence of usurpation, fraud or gross negligence, courts of equity will not interfere at the suit of a dissatisfied minority of shareholders merely to overrule and control the discretion of the directors on questions of corporate management, policy or business." *Gruber, supra,* 158 F.Supp. 603. A business judgment of the corporate directors will not be set aside absent a showing of "fraud, abuse of discretion or bad faith." *McDonald, supra* at 41 Ohio Misc. 162, 324 N.E.2d 785.

In its opposition to the motion for summary judgment, plaintiff advances the following arguments:

1. Coastal has not demonstrated the Litigation Oversight Committee's good faith nor the reasonableness of its conclusions.

2. The Court should make its own inquiry into the merits of the plaintiff's suit.

3. Plaintiff's claims are meritorious.

It is apparent that the second and third assertions are anchored in the plaintiff's argument that this Court should take the view that either the Ohio case law already impliedly endorses, as a part of the judicial scrutiny of the recommendation of a Litigation Oversight Committee, the exercise of its own independent business judgment or alternatively, consistent with *Zapata,* this Court should so act, applying the latitude given federal courts in interpreting state law where silence exists as set forth in *Commissioner of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). In the Court's view, a study of Ohio case law in conjunction with the statutory law of Ohio indicates a traditional approach to the business judgment rule of long standing. In this Court's view, the business judgment rule has stood the test of time and this Court is not prepared to modify it given that conclusion.[2]

Consequently, the focus of the Court's inquiry is necessarily limited to the plaintiff's claim that Coastal has not demonstrated the LOC's good faith nor the reasonableness of its conclusions.

In support of the argument regarding the lack of the LOC's good faith in recommending the dismissal of this action, the plaintiff makes the following points:

1. The burden of proof is on Coastal to demonstrate good faith on the part of the LOC. *Auerbach v. Bennett,* 47 N.Y.2d 619, 419 N.Y.S.2d 920, 929, 393 N.E.2d 994 (1979).

2. The dissents of the independent directors, Henderson and Jackson, are not described or addressed by the report and recommendation of the LOC.

3. The independence of the committee members is suspect.

4. The conduct of the investigation suggests a concerted effort to avoid scrutiny of the challenged transaction.

5. The report and recommendation contains no facts supportive of the Committee's conclusions so that the court is unable

---

2. The Sixth Circuit was recently presented with the issue of whether the Ohio courts would apply the differential business judgment rule or would exercise their own independent business judgment as in *Zapata.* The Court held, however, "we conclude that the district judge's review of the settlement decision complied with the more severe *Zapata* standard, however, we need not decide in this case which view the Ohio courts would adopt." *In re General Tire,* 726 F.2d 1075, 1083 (6th Cir., 1984).

to determine from the report whether the conclusions are reasonable or arbitrary.

The report and recommendation of the LOC is attached as appendix A. It is 23 pages in length. The first seven pages constitute an introduction stating the mandate given the LOC and identifying the members and the LOC's independent counsel. The next five pages describe the investigation undertaken by the LOC including the fact that several of the principal directors, i.e. Howard Ryder, James Pedler and Frank B. Reid, were interviewed, questionnaires were mailed to ten persons, plaintiff's counsel was interviewed, and the products of discovery were examined. Pages 13 through 16 repeat the allegations contained in paragraphs 15 through 29 of the plaintiff's amended complaint. The findings of the LOC begin at page 17. It is those findings which draw the fire of the plaintiff in his opposition to the motion for summary judgment with the criticism that the findings are unsupported by any factual findings.

The findings of the LOC address the allegations of paragraphs 15 through 29 of the amended complaint. The allegations and the LOC's response are as follows:

"[allegation]

"15. In 1976, defendant Champion conveyed to Coastal its wholly-owned subsidiary P.B. Mutrie Transportation Corp. ("Mutrie") in exchange for 230,000 shares of Coastal common stock, 800 shares of Coastal 6% cumulative $1,000.00 par preferred stock and 700 shares of Coastal $1,000.00 par senior preferred stock. Coastal had operated Mutrie for several years prior thereto. At the time of the 1976 transaction, the Coastal common stock had a market value of approximately $2.00 per share.

"[response]

"Paragraph 15 deals with the Coastal acquisition of P.B. Mutrie Transportation Corp., which acquisition was consummated in 1976. Special counsel advised the Committee that the Mutrie transaction is beyond the scope of subjects which may be properly challenged by plaintiff Holmstrom

because of the time period in which the transaction was effected. It appears to the Committee that the allegations in paragraph 15 are made in order to create the impression of joint business ventures among certain of the defendants. Such joint business activities will be addressed below.

"[allegation]

"16. By virtue of ownership of 20% of Coastal stock, and the cumulative voting provisions which governed that stock, defendant Champion, and its parent corporation Cascade, controlled several seats on the Coastal Board of Directors.

"[response]

"Paragraph 16 concerns the control of directorships on the company's board of directors by Cascade Industries, Inc. The Committee finds that, at the time of the transactions challenged in the Holmstrom Complaint, Cascade Industries, through cumulative voting, could control two seats on the Coastal board of directors.

"[allegation]

"17. In 1978, Coastal redeemed from defendant Champion 700 shares of senior preferred stock at par value.

"[response]

"The Committee finds the statement in paragraph 17 of the Holmstrom Complaint to be accurate.

"[allegation]

"18. Some time prior to November 1979, the management of Coastal, including defendant Ryder, perceived defendant Reid, through his control of defendants Champion and Cascade, as a threat to their control of the Board of Directors of Coastal. Management of Coastal believed that if defendant Reid did assume control of Coastal, the salaries, fees, bonuses and other remuneration which they were receiving from Coastal, totaling $681,715.00 in the fiscal year ended September 30, 1979, would be in jeopardy.

"[response]

"Paragraph 18 raises the subject of self-interest on the part of the company di-

rectors who subsequently voted in favor of the resolution authorizing the challenged transactions. The Committee finds that Frank Reid intended to undertake certain actions which would have had the likely result of Mr. Reid or Cascade Industries, Inc., being in a position to control a majority of the board of directors of the company. The Committee finds no evidence in support of the allegation that the votes of the directors who approved the Resolution which authorized the challenged transactions were influenced by self-interest or personal motivations.

"[allegation]

"19. Moreover, certain of the defendants, and particularly Reid and Pedler, had or had had certain overlapping business interests which sometime prior to November, 1979 they wished to disentangle. Among these overlapping interests were:

"a. At various times both defendants Reid and Pedler had been officers and directors of defendants Champion and Cascade.

"b. Defendant 44/40, of which defendant Pedler was Secretary and a director, owned approximately 16% of the outstanding common stock of defendant Cascade, of which at that time Reid was a director and officer.

"c. Defendant Pedler had personally guaranteed a loan in the amount of $2,300,-000 by Freuhauf [sic] Corporation ("Freuhauf") [sic] to defendant Champion. The Freuhauf [sic] loan was also secured by the pledge of the 230,000 shares of Coastal common stock and 800 shares of Coastal 6% preferred stock owned by Champion. As of December 1, 1979, the balance of the Freuhauf [sic] loan, in the amount of $1,700,000, was in default. On December 5, 1979 Freuhauf [sic] gave formal notice of its intention to hold a public auction of the pledged Coastal shares.

"[response]

"In paragraph 19, the subject of the relations between Messrs. Pedler and Reid is addressed. The Committee finds that Messrs. Pedler and Reid had indeed en-gaged in a number of business activities over the course of many years prior to 1979. The Committee concludes that any motivations of Mr. Pedler or Mr. Reid to discontinue mutual business affairs were independent of the decision of Coastal to acquire its stock via the challenged transactions.

"[allegation]

"20. As a result of the events and circumstances described in paragraphs 15–19 above, the defendants devised a plan and scheme whereby Coastal would purchase at an exorbitant price its common shares owned by Champion and defendants would otherwise use the assets of Coastal for their own personal benefit, much to Coastal's disadvantage, but greatly to the benefit of defendants other than Coastal.

"[response]

"Paragraph 20 appears to state the gravamen of the Holmstrom Complaint, that the defendants created a scheme which was intended to confer benefits upon the defendants other than the company at the expense of the company. The Committee finds no evidence that the defendants "devised a plan and scheme" which was ultimately evidenced by the challenged transactions. The Committee further finds that the directors who voted in favor of the resolution which authorized the challenged transactions were not motivated by personal interests. Other defendants either were not in a position to vote for or against the Resolution in question, voted against the Resolution or abstained from voting on the Resolution.

"[allegation]

"21. Pursuant to said unlawful plan and scheme, on November 27, 1979, Coastal's Board of Directors purposed to authorize:

"a) The acquisition by Coastal of the 390,000 shares of Coastal common stock then owned by defendant 44/40 and defendant Champion at $12.00 a share despite the fact that the common stock was selling only at $5–¾ in the over-the-counter market. Also authorized was the acquisition of the 6% preferred stock then owned by

Champion at par, although such preferred stock had a market value substantially below par. Four directors voted in favor of the acquisitions including defendants Ryder, Kelley, Reese and Siff. Two directors abstained, including defendant Nelson and Mr. D.E. Daggett [sic]. Two independent directors, Messrs. Jackson and Henderson, voted against.

"b) A recommendation to the stockholders to reduce Coastal's board from nine members to seven members.

"c) A recommendation to the shareholders for an amendment to Coastal's articles of incorporation rendering it more difficult for a tender offer to be made for Coastal's stock.

"d) A resolution permitting Coastal's Profit Sharing Trust to invest up to 100%, rather than the previously authorized 75%, of its assets in Coastal securities.

"[response]

"Paragraph 21 sets forth the measures which were approved by the board of directors of the company at its November 27, 1979, meeting. The directors authorized the company to acquire 390,000 shares of its common stock at up to $12.00 per share and all 800 shares of its 6% cumulative preferred stock at par value. The directors further authorized Resolutions recommending to the stockholders that the company's board of directors be reduced from nine to seven members, that a recommendation be made to the shareholders for an amendment of the company's articles of incorporation intended to protect the company's minority shareholders from unfavorable tender offers and that Coastal's Profit Sharing Plan and Trust investment limitations be modified to permit 100% investment in Coastal securities. The Committee finds the Resolutions adopted by the company's board of directors as set forth above were properly authorized by a majority vote of the directors present and voting.

"[allegation]

"22. Subsequent to the Coastal Board of Directors meeting of November 27, 1979, and in further pursuance of their unlawful plan and scheme, defendants arranged for defendant 44/40, acting as a conduit for Coastal, to acquire 230,000 shares of Coastal common stock and 800 shares of Coastal 6% preferred stock from defendant Champion. They further agreed that upon acquisition of those shares by defendant 44/40 from defendant Champion, Coastal would acquire 240,000 shares of its own common stock from defendant 44/40 at a price of $12.00 per share and would obligate itself to purchase up to all of the 800 shares of preferred stock at the par value thereof in three substantially equal annual installments commencing in February 1981. As part of this agreement, defendants also agreed that 44/40 would sell all of its Cascade stock to defendant Cascade.

"[response]

"The Committee finds no evidence to support the allegation in paragraph 22 that the defendants "arranged" the series of transactions as stated in paragraph 22. The Committee finds that the transaction between 44/40 Inc. and Cascade Industries, Inc., was negotiated and concluded independently of the challenged transaction between Coastal and 44/40 Inc.

"[allegation]

"23. On December 18, 1979, pursuant to the unlawful plan and scheme among the defendants, defendant 44/40 purchased from defendant Champion the 230,000 common shares and 800 6% preferred shares of Coastal then owned by defendant Champion and conveyed to defendant Champion all of the common stock of the defendant Cascade then owned by defendant 44/40. A portion of these proceeds were used to pay off the debt owed by defendant Champion to Freuhauf [sic] Corp., referred to in paragraph 19(c) above, thereby relieving defendant Pedler of his personal obligation on said loan.

"[response]

"The Committee finds, in accordance with the allegation in paragraph 23, that on December 18, 1979, 44/40 acquired from defendant Champion 230,000 shares of

common stock of the company and 800 shares of the company's 6% cumulative preferred stock. As discussed in the comments above regarding paragraph 22, however, the Committee finds no evidence to support the allegation that the 44/40—Champion transaction was part of an unlawful plan and scheme among the defendants. The Committee does find that a portion of the proceeds paid by 44/40 to Champion was used by Champion to satisfy the obligation it owed to Fruehauf Corporation. The Committee finds no evidence to support the suggestion by the plaintiff that the personal guarantee made by defendant Pedler on the obligation owed by Champion to Fruehauf played any role in the ultimate decision to authorize the challenged transactions.

"[allegation]

"24. On the same day, December 18, 1979, defendant 44/40 conveyed to Coastal 240,000 shares of Coastal common stock at a price of $12.00 per share and received Coastal's contractual commitment to purchase the 800 shares of 6% preferred stock at par in three equal annual installments.

"[response]

"The Committee finds paragraph 24 to contain an accurate statement of the substance of the challenged transactions.

"[allegation]

"25. In order to finance the purchase of the aforesaid stock, a subsidiary of Coastal was required to, and did, borrow a substantial sum of money at high rates of interest to the detriment of Coastal and its subsidiaries. Furthermore, the terms of Coastal's Pension Trust were amended so that it could increase its holdings of Coastal stock above the previous 75% limitation and a portion of the Coastal stock acquired from defendant Champion was then conveyed to the Pension Trust.

"[response]

"With respect to paragraph 25, the Committee finds that the manner of financing the challenged transactions selected by the company was not improper. The Committee further finds the modifications of the

Coastal Profit Sharing Plan and Trust not to have been improper.

"[allegation]

"26. On January 4, 1980, Coastal mailed a proxy statement to its shareholders with respect to a meeting of shareholders to be held on February 13, 1980. At the meeting of shareholders directors were to be elected and the amendment to Coastal's articles of incorporation relating to tender offers was to be voted upon.

"[response]

"Based upon advice of counsel, the Committee finds the allegation in paragraph 26 of the Amended Complaint to be beyond the scope of relevant inquiry. However, the Committee finds the statements in paragraph 26 to be accurate.

"[allegation]

"27. On February 5, 1980, Coastal filed suit against defendant Reid and two of his associates in the United States District Court for the Northern District of Ohio alleging that the defendants therein were seeking to seize control of Coastal and in so doing were violating the provisions of federal and state law. On February 6, 1980, that suit was dismissed upon the agreement of defendant Reid that he would not propose any nominees for Coastal's Board at the February 13 meeting, would not stand for election himself at that meeting, and would not vote for any one other than the management slate.

"[response]

"Based upon the advice of counsel, the Committee finds the allegations in paragraph 27 of the Amended Complaint to be beyond the scope of relevant inquiry. The Committee finds, however, that the statements in paragraph 27 are accurate.

"[allegation]

"28. At the meeting of Coastal stockholders on February 13, 1980, the membership of the Board of Directors was reduced from nine to seven members, management's slate was elected to office, and the amendment to the articles of incorporation relating to tender offers was adopted.

"[response]

"The Committee finds the statements of paragraph 28 to be accurate.

"[allegation]

"29. As a result of the events described herein:

"a. The threat posed by defendant Reid to control of Coastal's Board of Directors was eliminated through the improper use of Coastal's assets, and management enhanced its ability to remain in office and to receive continued compensation and other remuneration.

. "b. Defendant Pedler, by improper use of Coastal's assets, was relieved of his guarantee of the Freuhauf [sic] loan to defendant Champion.

"c. Defendants, and particularly defendants Reid and Pedler, by the improper use of Coastal's assets, were able to disentangle their overlapping business interests.

"d. The price which Coastal had paid to defendant Champion for Mutrie was retroactively substantially increased, unnecessarily and to the detriment of Coastal.

"e. Without any legitimate business purpose and for the private benefit of defendant herein, Coastal expended substantial sums of money and undertook substantial and unnecessary debt.

"[response]

"Paragraph 29 states the conclusions the plaintiff would have the Court reach in support of his claim. With respect to subparagraph (a), the Committee finds that defendant Reid intended to directly or indirectly attempt to assume control of the board of directors of the company and that the management of the company was justified in taking steps to eliminate such an attempt to assume control of the board. The Committee finds no evidence to support the allegation that Coastal's assets were improperly used to effect such purposes. Further, the Committee finds that, while the ability of management to remain in office may have been enhanced because of the challenged transactions, the directors who voted in favor of the Resolu-

tion authorizing the transactions were not improperly motivated in doing so. Their potentially enhanced ability to remain in office was an effect rather than a goal of the transactions.

"With respect to subparagraph (b) of paragraph 29, the Committee finds that the personal guarantee of defendant Pedler on the obligation of Champion to Fruehauf Corporation played no material role in the development of the challenged transactions.

"With respect to subparagraph (c) of paragraph 29, the Committee finds no evidence to support the allegation that defendants Reid and Pedler improperly used Coastal's assets as alleged therein.

"With respect to subparagraph (d) of paragraph 29, upon advice of counsel, the Committee finds the allegation therein to be beyond the scope of relevant inquiry. However, the Committee further finds there is no evidence to substantiate the allegation that the price Coastal paid Champion for P.B. Mutrie Transportation Corp. was "retroactively substantially increased."

"With respect to subparagraph (e) of paragraph 29, the Committee finds no evidence to support the allegation that the challenged transactions were without legitimate business purposes and were intended to serve the private interests of the defendants in the *Holmstrom* litigation.

"*Additional Findings*

"The Committee further finds that the price paid by Coastal for its common stock in the challenged transactions fell within the range of acceptable business alternatives available to the directors at the time of the adoption of the Resolution authorizing the transactions. The Committee further finds that the price paid and to be paid by the company for its 6% cumulative preferred stock fell within the range of acceptable business alternatives available to the directors at the time of the adoption of the Resolution authorizing the transactions."

■ The Court has carefully examined the report and recommendation of the LOC.

The Court has also conducted oral arguments with respect to the issue of whether the report and recommendation of the LOC constitutes an acceptable basis for granting summary judgment and dismissing the plaintiff's complaint. In the Court's view, the report and recommendation of the LOC is insufficient to justify granting summary judgment in favor of the defendants. The report and recommendation is devoid of factual findings to support the conclusions reached. The summary treatment of the issue of self dealing and use of the power as directors to perpetuate their self control negates the possibility of judicial approval of the work of the LOC. The Court is unable to declare on the issue of whether the LOC acted reasonably and in good faith. While the Court recognizes that the traditional business judgment rule is a deferential approach to judicial review of a business decision to terminate litigation, application of the rule does not require the Court to grant rubber stamp approval to the LOC. Accordingly, the motion for summary judgment is denied.

IT IS SO ORDERED.

## APPENDIX A

## FINAL REPORT OF THE LITIGATION OVERSIGHT COMMITTEE OF COASTAL INDUSTRIES, INC.

J. ROBERT WILSON, Chairman

MORRIS B. JOBE

ROBERT J. HIMMELRIGHT, JR.

RICHARD E. GUSTER
Special Counsel

ROETZEL & ANDRESS
20th Floor
One Cascade Plaza
Akron, Ohio 44308

DATED: December 9, 1981

## I. INTRODUCTION

A. *Proceedings Leading to the Appointment of the Committee*

On May 1, 1980, Peter G. Holmstrom, an individual who owned 500 shares of common stock in Coastal Industries, Inc. ("Coastal") commenced a stockholder's derivative suit in the United States District Court for the Northern District of Ohio, naming as defendants Coastal, Howard W. Ryder, Frank B. Reid, Michael T. Jackson, Llewellyn Reese, Alan L. Siff, Richard B. Nelson, Clarence A. Kelley, James S. Pedler, Jr., Champion Investments, Inc., Cascade Industries, Inc. and Forty-Four Forty, Inc.[1] The gravamen of the Complaint (and the tendered Amended Complaint which plaintiff has sought leave to file) is that the individual defendants perpetrated various transactions which involved self-dealing and/or self-interest and which greatly benefited all defendants other than Coastal at the expense of Coastal. As a stockholder's derivative suit, the real party in interest is Coastal; any recovery by plaintiff would inure to the direct benefit of Coastal.

Following the commencement of the action, on May 29, 1980, the board of directors of Coastal appointed director J. Robert Wilson to serve as conservator and protector of Coastal's interests in the litigation. Mr. Wilson, who had not been formally affiliated with Coastal at the time of the challenged activities, had been elected to the Coastal board by the shareholders at their annual meeting on February 13, 1980.

In furtherance of his role as corporate conservator, Mr. Wilson employed counsel to represent Coastal. The Answer of Coastal Industries, Inc., was prepared and served on June 24, 1980. Coastal responded to Plaintiff's Interrogatories and filed its Written Response to Plaintiff's Request to Produce (First Set) on November 17, 1980. Mr. Wilson was active in collecting the information necessary to finalize the preparation of the foregoing documents.

---

1. Mr. Holmstrom subsequently sold 400 shares of his Coastal stock; at present, he owns 100 shares.

On January 16, 1981, Mr. Wilson, in his capacity as conservator and protector of Coastal's interests, recommended to the board of directors of Coastal that a special committee, to be known as the Litigation Oversight Committee ("Committee"), be formed. Mr. Wilson suggested that the Committee be composed of himself, as chairman, and Messrs. Morris B. Jobe and Robert J. Himmelright, Jr., then standing for election to Coastal's board of directors. The proposal was scheduled for consideration at the January 21, 1981, organizational meeting of Coastal's directors, immediately following the annual meeting of shareholders.

Messrs. Jobe and Himmelright were duly elected to serve as directors by the shareholders on January 21, 1981, and the board of directors thereafter adopted the resolution proposed by Mr. Wilson, creating the Litigation Oversight Committee.[2]

B. *The Committee's Responsibilities, Composition and Resources*

1. *Responsibilities Delegated to the Committee*

Pursuant to Resolution of the board of directors of Coastal, the Committee was authorized to investigate all claims arising from the *Holmstrom* litigation. The board of directors delegated to the Committee authority to exercise the business judgment of the company with respect to formulating a position to be taken in regard to the litigation. The Committee was specifically empowered to determine whether to join with plaintiff in active prosecution of the case, or to defend the actions of its directors by opposing plaintiff's claims or to remain neutral. The Committee was also empowered to commence separate proceedings against any person(s) regarding matters under investigation. Finally, the Committee was given authority to determine the bases, if any, upon which claims within the scope of the Committee's authority could be settled and/or released.

2. A copy of the Resolution of the board of directors adopted January 21, 1981, is attached

2. *Sources of Committee Responsibilities and Resources*

The Resolution of the company's board of directors was passed by unanimous vote at the January 21, 1981, organizational meeting. The Committee was specifically composed of director J. Robert Wilson and newly elected directors Morris B. Jobe and Robert J. Himmelright, Jr. All members of the Committee commenced service as directors after November 27, 1979 (the date upon which the company's board of directors authorized the transactions which are the subject of the *Holmstrom* litigation). Mr. Wilson was appointed chairman of the Committee.

As indicated above, the Committee was directed to investigate all claims arising out of the *Holmstrom* litigation.

The Committee was further directed to commence its activities immediately following the meeting of the board at which the enabling Resolution was passed. The Committee was instructed to meet as frequently as it deemed appropriate and to report to the board of directors on at least a quarterly basis.

The continued retention of Richard E. Guster and Roetzel & Andress as the Committee's independent special counsel was approved. The Committee was expressly invited to utilize the staff and resources of the company as it deemed desirable.

3. *Composition of the Committee*

The Committee is comprised of J. Robert Wilson, Morris B. Jobe and Robert J. Himmelright, Jr., all of whom are members of the company's board of directors but have never been employed by the company. Mr. Wilson joined the board of directors in 1980; Messrs. Jobe and Himmelright joined the board in 1981. None of the Committee members have had any prior involvement in any of the matters investigated by the Committee. No Committee member has

as Exhibit A.

been named a defendant in the *Holmstrom* litigation.

Mr. Wilson is admitted to the bars of the State of Ohio and the Supreme Court of the United States. He received his Ph.B. degree from the University of Wisconsin in 1936 and his J.D. degree from the University of Akron School of Law in 1946. Mr. Wilson has served as a special agent of the Federal Bureau of Investigation of the United States Department of Justice. He has been engaged in the private practice of law and performed independent consulting services. Mr. Wilson became associated with Roadway Express, Inc., in 1951 and served as director and vice-president of employee and labor relations, as executive vice-president, as president for seven years and as vice-chairman of the board of directors. He served as a director of Roadway for nineteen years. He serves or has served as a director of First National Bank of Akron, Trustee of Hiram College, Trustee of Bath Township, Trustee of Akron General Medical Center and as an independent business consultant. Apart from short-term consulting work several years prior to his election to the board of directors, Mr. Wilson has had no prior contact with the company.

Morris B. Jobe received his Bachelors degree from the University of Akron in 1938 and his Certificate in Advanced Management from Northwestern University in 1957. Mr. Jobe became associated with the Goodyear Tire & Rubber Company in 1938 and served in various capacities with Goodyear until he accepted a position at Goodyear Aerospace Corporation. He served as president and chief executive officer of Goodyear Aerospace from 1968 until his retirement in June 1980. Other than his directorship with Coastal, Mr. Jobe currently serves as a director of Plastic & Rubber Products, Inc., of Houston, Texas. He has been a professor of engineering at the University of Akron since 1980. Mr. Jobe served as chairman of the board of trustees of the National Industrial Security Association, and served as executive director, member of the board and member of the finance committee of the Aerospace

Industrial Association. He also served as Chairman of the United States delegation to the NATO Industrial Advisory Group from 1972 to 1977. Mr. Jobe had no contact with the company until his election to the board of directors in 1981.

Robert J. Himmelright, Jr., received his Bachelors degree in English literature from the University of New Mexico in 1951. Mr. Himmelright has been associated with Teledyne Monarch Rubber Company since 1949 and has been president since 1963. Mr. Himmelright currently serves as director of First National City Bank of Alliance, Ohio; of Jaite Packaging Company of Akron, Ohio; of Industrial Tires Limited of Toronto, Ontario; of the Rubber Manufacturers Association of America of Washington, D.C.; and of Coastal Industries, Inc. He also serves as a trustee of Kenyon College in Gambier, Ohio. Mr. Himmelright had no connection with Coastal prior to his election to the board of directors in 1981.

### 4. *The Committee's Independent Special Counsel*

J. Robert Wilson, during his tenure as conservator and protector of the interests of Coastal Industries, was authorized by the board of directors of Coastal to retain independent special counsel to represent Coastal in connection with the *Holmstrom* litigation. Following the formation of the Litigation Oversight Committee, the Committee elected to continue retention of Richard E. Guster and the law firm of Roetzel & Andress as its independent special counsel. Prior to his employment as special counsel, neither Mr. Guster nor his firm had any professional connection to the company. Mr. Guster has been engaged in the private practice of law since his graduation from Western Reserve University School of Law in 1955. He is admitted to practice before the bars of the State of Ohio, the United States District Court for the Northern District of Ohio and the District of Maryland, the United States Court of Claims, the United States Court of Appeals (Sixth Circuit) and the United States

Supreme Court. He is a Life Member of the United States Sixth Circuit Judicial Conference and a Fellow of the American College of Trial Lawyers.

The Committee entrusted Mr. Guster and his associates with conducting the investigation subject to the Committee's supervision and direction. In addition to carrying out his factual investigation, Mr. Guster has provided legal advice to the Committee in connection with all areas of its responsibility.

## II. THE COMMITTEE'S INVESTIGATION

### A. *Scope of the Investigation*

The Holmstrom Amended Complaint defined the essential scope of the investigation, both as to the substantive areas for consideration and the periods reviewed. Although certain allegations made by plaintiff were in special counsel's opinion barred by their remoteness in time, those claims were investigated nevertheless in the interest of thoroughness. The Committee examined every issue considered to be pertinent or related to the major areas of consideration.

### B. *Investigative Procedures*

#### 1. *The Committee*

The Committee has supervised the conduct of this investigation, and it has in connection therewith (i) approved the investigative procedures, (ii) issued general and specific directives regarding the investigation, and (iii) made recommendations to the company through special counsel in response to findings made in the investigation. The Committee authorized its counsel to handle the daily conduct of the investigation.

The Committee held its organizational meeting on January 21, 1981. During the course of that meeting, the Committee devised its preliminary plan for conducting the investigation required by its charge. Following extensive discussions with its counsel, the Committee instructed counsel to file a motion seeking a stay of proceedings in the *Holmstrom* litigation pending the completion of the Committee's investigative procedures. Counsel filed such a motion on February 2, 1981, and filed appropriate reply and supplementary memoranda on several occasions thereafter.

The Committee's plan as initiated and developed, encompassed the following identifiable although sometimes overlapping steps: (1) identification of issues involved in the litigation; (2) review of corporate documents and records; (3) assembly and analysis of statistical data; (4) review and consideration of information developed by and from deposition, responses to interrogatories and plaintiff's requests of certain defendants for documents; (5) development of questionnaires to the defendants and a cross-evaluation of responses received; (6) the personal interview and, in certain instances, the re-interview of selected defendants as well as interviewing plaintiff's counsel; and (7) the cross-checking and evaluation of the information developed by (5) and (6) above in the light of and giving consideration to information and facts developed during the course of the preceding enumerated steps.

The Committee held formal meetings on approximately a monthly basis, other than during the month of February 1981 when counsel was engaged in the gathering and organization of background information. The Committee held a number of informal meetings during the course of its investigation. The chairman of the Committee was in frequent contact with counsel, often consulting several times per week. Innumerable telephone conferences were held among the members of the Committee and special counsel during the course of the investigation.

During the course of formal meetings, the Committee reviewed investigative information gathered by counsel and documents pertaining to specific allegations. Special counsel also provided the Committee with legal opinions where necessary and helpful to the Committee's task. Periodically, after reviewing special counsel's efforts, the

Committee requested that further work be done in a specific area.

### 2. Consultation with Coastal Personnel

Because two of the three members of the Committee had no prior involvement with the company, one of the first steps in the investigation was to become familiar with the company's organization and identify personnel who could provide information and assistance in the inquiry.

The Committee's inquiry has been supported by management of the company. In particular, Howard W. Ryder devoted substantial time to assisting the Committee and identifying company personnel and records that were essential to this investigation. Mr. Wilson worked closely with the administrative and staff personnel in gathering and sequestering documents relevant to the inquiry.

Counsel received extensive assistance from Mr. Ryder's executive secretary, Ednamae Polen, in gathering and making available corporate records and similar pertinent information. Counsel and his associates were in frequent telephonic contact with Mr. Ryder and his staff regarding matters in need of clarification that had arisen in regard to documents provided.

### 3. Document Review

An investigation of this magnitude necessarily requires the examination and assimilation of thousands of pages of documents, ranging from board minutes to insignificant corporate papers. Counsel and his associates reviewed minutes of the meetings of the company's board of directors from the formation of the company through the present, SEC filings and annual reports from the formation of the company through the present and other documents considered to have a bearing upon the matters which were of interest in the investigation. Counsel and his associates also gathered information from the company stock transfer records regarding purchases and sales of company stock during the period from the formation of the com-

pany through the present. In addition, an examination was made of the NASDAQ–OTC market quotations for the company's common stock from the date when such listings were first made public through the present. Documents produced during the course of discovery by other defendants and by Fruehauf Corporation were reviewed. The Committee was provided with documents from certain of the persons contacted for interviews as well. In all, many thousands of pages of documents were reviewed.

### 4. Interviews

The Committee interviewed Howard W. Ryder on March 12 and 13, 1981. A follow-up interview with Mr. Ryder's counsel to obtain clarification of certain matters was held thereafter. Following the completion of a number of other investigative procedures, the Committee interviewed James S. Pedler, Jr., on September 8, 1981, and special counsel conducted a number of telephonic conferences with Mr. Pedler's counsel thereafter to obtain clarification of various matters. On September 11, 1981, the Committee interviewed Howard W. Ryder once again. Subsequent to the re-interview of Howard W. Ryder, counsel held a number of telephonic follow-up conferences with Mr. Ryder and his counsel to obtain clarification of various matters raised during the course of the continuing investigation. On September 17, 1981, the Committee interviewed Frank B. Reid and Walter W. Crate. Special counsel conducted a number of telephonic follow-up conferences with Mr. Reid's counsel in order to obtain clarification of various matters. A number of telephonic conferences were held with various other persons, including counsel for the individual defendants and the independent auditors of Coastal at Ernst & Whinney. In addition, Howard W. Ryder was informally consulted on a number of occasions to provide additional information regarding Coastal and its operations.

### 5. Questionnaires

The Committee submitted questionnaires to D.E. Daggitt, Ronald H. Henderson, Mi-

chael T. Jackson, Clarence A. Kelley, Richard B. Nelson, James S. Pedler, Jr., Llewellyn Reese, Frank B. Reid, Howard W. Ryder and Alan L. Siff. All questionnaires were mailed on June 29, 1981, to the proposed respondents. Responses were received from all of those to whom questionnaires were submitted other than Messrs. Henderson and Daggitt. Special counsel obtained information from Mr. Henderson's counsel regarding his position and regarding documents furnished by Mr. Henderson to plaintiff's counsel in connection with plaintiff's counsel's investigation. Following receipt and analysis of all the questionnaire responses, the Committee conducted the interviews referred to in the preceding segment of this report. Counsel furnished copies of all the questionnaire forms to plaintiff's counsel following receipt of a request for same.

### 6. *Plaintiff's Counsel*

The law firm of Pomerantz, Levy, Haudek & Block acts as counsel for the plaintiff shareholder in the *Holmstrom* litigation. Judah I. Labovitz, formerly a partner in the Pomerantz firm in charge of the prosecution of the *Holmstrom* litigation, was invited to meet with the Committee and present plaintiff's position concerning the issues raised by the litigation. The Committee in fact met with Mr. Labovitz on June 26, 1981, at which time he furnished information and viewpoints to the Committee. In addition, correspondence was had between plaintiff's counsel and special counsel on several occasions regarding certain additional matters for consideration by the Committee. The Committee gratefully acknowledges the cooperation of Mr. Labovitz.

### 7. *Products of Discovery in Pending Proceedings*

As mentioned above, the Committee examined documents produced during the course of discovery in the *Holmstrom* litigation. In addition, the Committee analyzed the responses to interrogatories and requests for production of documents filed by the various other defendants. The Committee also reviewed the testimony of Peter G. Holmstrom and Clarence A. Kelley resulting from the depositions of those two men.

### III. THE ALLEGATIONS OF THE AMENDED COMPLAINT IN HOLMSTROM V. COASTAL INDUSTRIES, INC., ET AL.

The Committee analyzed the actions alleged by plaintiff in paragraphs 15 through 29 of the Amended Complaint. The Committee notes that the Court has not granted plaintiff leave to file the Amended Complaint; however, the Committee based its analysis on that document because of the greater particularity of the allegations contained therein as compared with the initial Complaint. Since the Amended Complaint has not been formally filed in the *Holmstrom* litigation, the allegations of paragraphs 15 through 29 are set forth below and made a part of this report in order to indicate the framework for the analysis undertaken by the Committee.

15. In 1976, defendant Champion conveyed to Coastal its wholly-owned subsidiary P.B. Mutrie Transportation Corp. ("Mutrie") in exchange for 230,000 shares of Coastal common stock, 800 shares of Coastal 6% cumulative $1,000.00 par preferred stock and 700 shares of Coastal $1,000.00 par senior preferred stock. Coastal had operated Mutrie for several years prior thereto. At the time of the 1976 transaction, the Coastal common stock had a market value of approximately $2.00 per share.

16. By virtue of ownership of 20% of Coastal stock, and the cumulative voting provisions which governed that stock, defendant Champion, and its parent corporation Cascade, controlled several seats on the Coastal Board of Directors.

17. In 1978, Coastal redeemed from defendant Champion 700 shares of senior preferred stock at par value.

18. Some time prior to November 1979, the management of Coastal, including defendant Ryder, perceived defend-

ant. Reid, through his control of defendants Champion and Cascade, as a threat to their control of the Board of Directors of Coastal. Management of Coastal believed that if defendant Reid did assume control of Coastal, the salaries, fees, bonuses and other remuneration which they were receiving from Coastal, totalling $681,715.00 in the fiscal year ended September 30, 1979, would be in jeopardy.

19. Moreover, certain of the defendants, and particularly Reid and Pedler, had or had had certain overlapping business interests which sometime prior to November, 1979 they wished to disentangle. Among these overlapping interests were:

a. At various times both defendants Reid and Pedler had been officers and directors of defendants Champion and Cascade.

b. Defendant 44/40, of which defendant Pedler was Secretary and a director, owned approximately 16% of the outstanding common stock of defendant Cascade, of which at that time Reid was a director and officer.

c. Defendant Pedler had personally guaranteed a loan in the amount of $2,300,000 by Freuhauf [sic] Corporation ("Freuhauf") [sic] to defendant Champion. The Freuhauf [sic] loan was also secured by the pledge of the 230,000 shares of Coastal common stock and 800 shares of Coastal 6% preferred stock owned by Champion. As of December 1, 1979, the balance of the Freuhauf [sic] loan, in the amount of $1,700,000, was in default. On December 5, 1979 Freuhauf [sic] gave formal notice of its intention to hold a public auction of the pledged Coastal shares.

20. As a result of the events and circumstances described in paragraphs 15–19 above, the defendants devised a plan and scheme whereby Coastal would purchase at an exorbitant price its common shares owned by Champion and defendants would otherwise use the assets of Coastal for their own personal benefit, much to Coastal's disadvantage, but greatly to the benefit of defendants other than Coastal.

21. Pursuant to said unlawful plan and scheme, on November 27, 1979, Coastal's Board of Directors purported to authorize:

a) The acquisition by Coastal of the 390,000 shares of Coastal common stock then owned by defendant 44/40 and defendant Champion at $12.00 a share despite the fact that the common stock was selling only at $5–¾ in the over-the-counter market. Also authorized was the acquisition of the 6% preferred stock then owned by Champion at par, although such preferred stock had a market value substantially below par. Four directors voted in favor of the acquisitions including defendants Ryder, Kelley, Reese and Siff. Two directors abstained, including defendant Nelson and Mr. D.E. Daggett [sic]. Two independent directors, Messrs. Jackson and Henderson, voted against.

b) A recommendation to the stockholders to reduce Coastal's board from nine members to seven members.

c) A recommendation to the shareholders for an amendment to Coastal's articles of incorporation rendering it more difficult for a tender offer to be made for Coastal's stock.

d) A resolution permitting Coastal's Profit Sharing Trust to invest up to 100%, rather than the previously authorized 75%, of its assets in Coastal securities.

22. Subsequent to the Coastal Board of Directors meeting of November 27, 1979, and in further pursuance of their unlawful plan and scheme, defendants arranged for defendant 44/40, acting as a conduit for Coastal, to acquire 230,000 shares of Coastal common stock and 800 shares of Coastal 6% preferred stock from defendant Champion. They further agreed that upon acquisition of those shares by defendant 44/40 from defendant Champion, Coastal would acquire 240,000 shares of its own common stock from defendant 44/40 at a price of $12.00 per share and would obligate itself to

purchase up to all of the 800 shares of preferred stock at the par value thereof in three substantially equal annual installments commencing in February 1981. As part of this agreement, defendants also agreed that 44/40 would sell all of its Cascade stock to defendant Cascade.

23. On December 18, 1979, pursuant to the unlawful plan and scheme among the defendants, defendant 44/40 purchased from defendant Champion the 230,000 common shares and 800 6% preferred shares of Coastal then owned by defendant Champion and conveyed to defendant Champion all of the common stock of the defendant Cascade then owned by defendant 44/40. A portion of these proceeds were used to pay off the debt owed by defendant Champion to Freuhauf [sic] Corp., referred to in paragraph 19(c) above, thereby relieving defendant Pedler of his personal obligation on said loan.

24. On the same day, December 18, 1979, defendant 44/40 conveyed to Coastal 240,000 shares of Coastal common stock at a price of $12.00 per share and received Coastal's contractual commitment to purchase the 800 shares of 6% preferred stock at par in three equal annual installments.

25. In order to finance the purchase of the aforesaid stock, a subsidiary of Coastal was required to, and did, borrow a substantial sum of money at high rates of interest to the detriment of Coastal and its subsidiaries. Furthermore, the terms of Coastal's Pension Trust were amended so that it could increase its holdings of Coastal stock above the previous 75% limitation and a portion of the Coastal stock acquired from defendant Champion was then conveyed to the Pension Trust.

26. On January 4, 1980, Coastal mailed a proxy statement to its shareholders with respect to a meeting of shareholders to be held on February 13, 1980. At the meeting of shareholders directors were to be elected and the amendment to Coastal's articles of incor-poration relating to tender offers was to be voted upon.

27. On February 5, 1980, Coastal filed suit against defendant Reid and two of his associates in the United States District Court for the Northern District of Ohio alleging that the defendants therein were seeking to seize control of Coastal and in so doing were violating the provisions of federal and state law. On February 6, 1980, that suit was dismissed upon the agreement of defendant Reid that he would not propose any nominees for Coastal's Board at the February 13 meeting, would not stand for election himself at that meeting, and would not vote for any one other than the management slate.

28. At the meeting of Coastal stockholders on February 13, 1980, the membership of the Board of Directors was reduced from nine to seven members, management's slate was elected to office, and the amendment to the articles of incorporation relating to tender offers was adopted.

29. As a result of the events described herein:

a. The threat posed by defendant Reid to control of Coastal's Board of Directors was eliminated through the improper use of Coastal's assets, and management enhanced its ability to remain in office and to receive continued compensation and other remuneration.

b. Defendant Pedler, by improper use of Coastal's assets, was relieved of his guarantee of the Freuhauf [sic] loan to defendant Champion.

c. Defendants, and particularly defendants Reid and Pedler, by the improper use of Coastal's assets, were able to disentangle their overlapping business interests.

d. The price which Coastal had paid to defendant Champion for Mutrie was retroactively substantially increased, unnecessarily and to the detriment of Coastal.

e. Without any legitimate business purpose and for the private benefit of

defendants herein, Coastal expended substantial sums of money and undertook substantial and unnecessary debt.

## IV. FINDINGS OF THE COMMITTEE

The Committee investigated each of the separate allegations made in the Holmstrom Amended Complaint. These allegations fall into five general groups: (i) relations between James S. Pedler, Jr., and Frank B. Reid; (ii) history of the transactions challenged; (iii) Reid take-over threat; (iv) self-interest of the directors; and (v) price paid for Coastal stock. The analysis set forth in these findings is patterned upon the order of allegations set forth in paragraphs 15 through 29 of the Amended Complaint.

Paragraph 15 deals with the Coastal acquisition of P.B. Mutrie Transportation Corp., which acquisition was consummated in 1976. Special counsel advised the Committee that the Mutrie transaction is beyond the scope of subjects which may be properly challenged by plaintiff Holmstrom because of the time period in which the transaction was effected. It appears to the Committee that the allegations in paragraph 15 are made in order to create the impression of joint business ventures among certain of the defendants. Such joint business activities will be addressed below.

Paragraph 16 concerns the control of directorships on the company's board of directors by Cascade Industries, Inc. The Committee finds that, at the time of the transactions challenged in the Holmstrom Complaint, Cascade Industries, through cumulative voting, could control two seats on the Coastal board of directors.

The Committee finds the statement in paragraph 17 of the Holmstrom Complaint to be accurate.

Paragraph 18 raises the subject of self-interest on the part of the company directors who subsequently voted in favor of the resolution authorizing the challenged transactions. The Committee finds that Frank Reid intended to undertake certain actions which would have had the likely result of Mr. Reid or Cascade Industries, Inc., being in a position to control a majority of the board of directors of the company. *The Committee finds no evidence in support of the allegation that the votes of the directors who approved the Resolution which authorized the challenged transactions were influenced by self-interest or personal motivations.*

In paragraph 19, the subject of the relations between Messrs. Pedler and Reid is addressed. The Committee finds that Messrs. Pedler and Reid had indeed engaged in a number of business activities over the course of many years prior to 1979. *The Committee concludes that any motivations of Mr. Pedler or Mr. Reid to discontinue mutual business affairs were independent of the decision of Coastal to acquire its stock via the challenged transactions.*

Paragraph 20 appears to state the gravamen of the Holmstrom Complaint, that the defendants created a scheme which was intended to confer benefits upon the defendants other than the company at the expense of the company. *The Committee finds no evidence that the defendants "devised a plan and scheme" which was ultimately evidenced by the challenged transactions.* The Committee further finds that the directors who voted in favor of the resolution which authorized the challenged transactions *were not motivated by personal interests.* Other defendants either were not in a position to vote for or against the Resolution in question, voted against the Resolution or abstained from voting on the Resolution.

Paragraph 21 sets forth the measures which were approved by the board of directors of the company at its November 27, 1979, meeting. The directors authorized the company to acquire 390,000 shares of its common stock at up to $12.00 per share and all 800 shares of its 6% cumulative preferred stock at par value. The directors further authorized Resolutions recommending to the stockholders that the company's board of directors be reduced from nine to

seven members, that a recommendation be made to the shareholders for an amendment of the company's articles of incorporation intended to protect the company's minority shareholders from unfavorable tender offers and that Coastal's Profit Sharing Plan and Trust investment limitations be modified to permit 100% investment in Coastal securities. The Committee finds the Resolutions adopted by the company's board of directors as set forth above were properly authorized by a majority vote of the directors present and voting.

The Committee finds no evidence to support the allegation in paragraph 22 that the defendants "arranged" the series of transactions as stated in paragraph 22. *The Committee finds that the transaction between 44/40 Inc. and Cascade Industries, Inc., was negotiated and concluded independently of the challenged transaction between Coastal and 44/40 Inc.*

The Committee finds, in accordance with the allegation in paragraph 23, that on December 18, 1979, 44/40 acquired from defendant Champion 230,000 shares of common stock of the company and 800 shares of the company's 6% cumulative preferred stock. As discussed in the comments above regarding paragraph 22, however, the Committee finds no evidence to support the allegation that the 44/40—Champion transaction was part of an unlawful plan and scheme among the defendants. The Committee does find that a portion of the proceeds paid by 44/40 to Champion was used by Champion to satisfy the obligation it owed to Fruehauf Corporation. *The Committee finds no evidence to support the suggestion by the plaintiff that the personal guarantee made by defendant Pedler on the obligation owed by Champion to Fruehauf played any role in the ultimate decision to authorize the challenged transactions.*

The Committee finds paragraph 24 to contain an accurate statement of the substance of the challenged transactions.

With respect to paragraph 25, the Committee finds that the manner of financing the challenged transactions selected by the company was not improper. The Committee further finds the modifications of the Coastal Profit Sharing Plan and Trust not to have been improper.

Based upon advice of counsel, the Committee finds the allegation in paragraph 26 of the Amended Complaint to be beyond the scope of relevant inquiry. However, the Committee finds the statements in paragraph 26 to be accurate.

Based upon the advice of counsel, the Committee finds the allegations in paragraph 27 of the Amended Complaint to be beyond the scope of relevant inquiry. The Committee finds, however, that the statements in paragraph 27 are accurate.

The Committee finds the statements of paragraph 28 to be accurate.

Paragraph 29 states the conclusions the plaintiff would have the Court reach in support of his claim. With respect to subparagraph (a), the Committee finds that defendant Reid intended to directly or indirectly attempt to assume control of the board of directors of the company and that the management of the company was justified in taking steps to eliminate such an attempt to assume control of the board. The Committee finds no evidence to support the allegation that Coastal's assets were improperly used to effect such purposes. Further, the Committee finds that, while the ability of management to remain in office may have been enhanced because of the challenged transactions, *the directors who voted in favor of the Resolution authorizing the transactions were not improperly motivated in doing so.* Their potentially enhanced ability to remain in office was an effect rather than a goal of the transactions.

With respect to subparagraph (b) of paragraph 29, the Committee finds that the *personal guarantee of defendant Pedler on the obligation of Champion to Fruehauf Corporation played no material role in the development of the challenged transactions.*

With respect to subparagraph (c) of paragraph 29, the Committee finds no evidence

to support the allegation that defendants Reid and Pedler improperly used Coastal's assets as alleged therein.

With respect to subparagraph (d) of paragraph 29, upon advice of counsel, the Committee finds the allegation therein to be beyond the scope of relevant inquiry. However, the Committee further finds there is no evidence to substantiate the allegation that the price Coastal paid Champion for P.B. Mutrie Transportation Corp. was "retroactively substantially increased."

With respect to subparagraph (e) of paragraph 29, the Committee finds no evidence to support the allegation that the challenged transactions were without legitimate business purposes and were intended to serve the private interests of the defendants in the *Holmstrom* litigation.

*Additional Findings*

The Committee further *finds that the price paid by Coastal for its common stock in the challenged transactions fell within the range of acceptable business alternatives* available to the directors at the time of the adoption of the Resolution authorizing the transactions. The Committee further finds that the price *paid and to be paid by the company for its 6% cumulative preferred stock fell within the range of acceptable business alternatives* available to the directors at the time of the adoption of the Resolution authorizing the transactions.

## V. CONCLUSIONS

In conclusion, the Committee finds that the actions of the directors voting in favor of the Resolutions which authorized the challenged transactions were not motivated by self-interest. Rather, the actions of such directors were motivated by legitimate desires to eliminate the threat of a control fight perpetrated by Frank B. Reid and his associates. The Committee finds any costs incurred by Coastal as a result of the challenged transactions and the manner of financing the same to have been appropriately incurred in order to lead to the desired result. The Committee finds no

improper benefits to have been conferred upon the defendants herein as a result of the challenged transactions. *Further, the Committee specifically concludes that the continued maintenance of the Holmstrom litigation would be contrary to the best interests of Coastal Industries, Inc.*

## VI. RECOMMENDATION

In view of the Committee's investigations and the findings and conclusions contained herein, the Committee has instructed its independent special counsel to seek dismissal or other summary disposition of the *Holmstrom* litigation on behalf of the company in a manner consistent with this report.

## EXHIBIT A

### RESOLUTION

RESOLVED, That there is hereby created a Special Committee to be known as the Litigation Oversight Committee (hereinafter "Committee") which shall have the following characteristics, powers and responsibilities:

(1) The Committee is composed of Robert J. Himmelright, Jr., Maurice B. Jobe and J. Robert Wilson, directors of Coastal Industries, Inc. whose terms in office commenced after November 27, 1979 and who had no previous service as a director of Coastal Industries, Inc. prior to said date. Director J. Robert Wilson shall serve as Chairman of the Committee.

(2) The Committee is expressly authorized to investigate all claims now or hereafter pending, or arising out of, the litigation styled *Peter G. Holmstrom v. Coastal Industries, Inc.*, Civil Action No. C80–670A, United States District Court, Northern District of Ohio.

(3) The members of the Committee are to meet immediately following the meeting of this Board at which this Resolution is adopted and agree upon the claims to be evaluated, the method(s) to be used in said evaluation, and a

proposed timetable for the completion of the evaluation. The Committee shall be required to report on its progress or findings to this Board on a quarterly basis, or more often as it shall deem appropriate, until its evaluation is completed or until the termination of the *Holmstrom* litigation, whichever shall last occur.

(4) The Committee shall assume the responsibilities, duties and powers delegated by this Board to J. Robert Wilson by Resolution adopted May 29, 1980. Since the adoption of said Resolution, J. Robert Wilson has acted in a manner consistent with his powers and duties as conservator and protector of the interests of Coastal Industries, Inc. In so acting, Mr. Wilson has been active in reviewing the records of Coastal Industries, Inc., analyzing requests for discovery made by various parties to the *Holmstrom* litigation, and in responding to said requests. This Board hereby confirms and ratifies the actions of J. Robert Wilson taken in regard to the *Holmstrom* litigation.

(5) The Committee is authorized to continue the retention of Richard E. Guster and the firm of Roetzel & Andress, Akron, Ohio as its own independent counsel, which retention was approved by Resolution of this Board of May 29, 1980 and to retain such other advisors and experts as it deems necessary. The Committee is also authorized to utilize the staff and resources of Coastal Industries, Inc. to the extent it deems desirable to perform its duties.

(6) The Special Committee is delegated the authority to exercise the business judgment of Coastal Industries, Inc. and to determine and implement the action to be taken by Coastal Industries, Inc. in response to any findings made by the Committee, including but not limited to the following:

(i) Whether it is in the best interests of Coastal Industries, Inc. to: a) take an affirmative position in regard to the allegations made by plaintiff and join in active prosecution of the same, or b) defend vigorously the actions taken by its directors and oppose plaintiff's claims and any other claims or counterclaims that may exist or arise in connection with this litigation, or c) assert neither an affirmative nor a negative position in the prosecution or defense of said litigation.

(ii) Whether it is in the best interests of Coastal Industries, Inc. to institute separate litigation or assert additional claims in pending litigation against any person in connection with any matter under investigation, and

(iii) The terms, if any, upon which any claim within the scope of the Committee's responsibility should be settled and/or released, and further, to take all steps necessary to effect such settlements and/or releases.

(7) Each member of the Committee shall be compensated for his time spent in participating in meetings or sessions of the Committee at a rate of Eight Hundred Dollars ($800.00) per diem, with each day to be divided into 1/4 day increments and with a minimum compensation of Two Hundred Dollars ($200.00) for any portion of a day so spent. Each member of the Committee shall further be compensated for his time spent in preparing for meetings of the Committee at a rate of One Hundred Dollars ($100.00) per hour of time spent with each hour to be divided into 1/4 hour increments.

ADOPTED January 21, 1981.

## ON MOTION FOR SUMMARY JUDGMENT

The defendant, Coastal Industries, Inc., (hereinafter Coastal), filed a motion for summary judgment based upon the recommendation of the Litigation Oversight Committee (hereinafter LOC). The Court by a memorandum opinion filed on March 6, 1981, denied the motion for summary judgment.

In the memorandum opinion of March 6, 1981, the Court reviewed the application of

the business judgment rule to derivative shareholders actions and in particular in the context of Ohio law. The Court concluded that a study of Ohio case law in conjunction with the statutory law of Ohio indicates a traditional approach to the business judgment rule of long standing.[1] The Court thus indicated that it would not entertain or exercise its own business judgment with respect to the recommendation of the LOC. Continuing, the Court focused on the plaintiff's claim that Coastal had not demonstrated the LOC's good faith nor the reasonableness of its conclusions. The Court then discussed at some length the final report of the LOC dated December 9, 1981. The Court concluded that it was unable to determine or declare on the issue of whether the LOC acted reasonably and in good faith, and as a consequence, denied Coastal's motion for summary judgment.

Thereafter, Coastal filed on March 19, 1984, a motion for reconsideration submitted in support of the motion for the Court's *in camera* inspection supporting papers for the recommendation of the LOC to dismiss the case. The Court summarily overruled the motion without examination of the papers submitted for the requested *in camera* inspection. At a subsequent status call conducted on April 19, 1984, counsel for the LOC orally requested leave of Court to renew its request for reconsideration of the overruling of the motion for summary judgment. The Court allowed Coastal to submit a subsequent written renewal of the request for reconsideration for summary judgment and the same was filed on May 1, 1984. After considering the objections filed by counsel for the plaintiff on May 14, 1984, the Court sustained Coastal's request for reconsideration upon the following conditions:

1. The additional documentation to which reference was made in the written request of May 1, 1984, was to be filed with the Court and counsel of the plaintiff no later than June 11, 1984 with the appropriate certificate of counsel for the LOC indicating that the additional documentation is complete and that no matters had been withheld from the Court or opposing counsel on the basis of an attorney-client privilege, a work-product privilege, or any other privilege.

2. The plaintiff would have the right to question or challenge the work of the LOC on an accelerated discovery schedule and if requested, the members of the LOC were to make themselves available for deposition in New York City at the expense of Coastal.

3. Plaintiff was granted leave until September 1, 1984, to file a supplemental brief in opposition to Coastal's motion for summary judgment.

4. Coastal was granted a maximum of ten days to respond to plaintiff's supplemental brief in opposition to Coastal's motion for summary judgment.

In accordance with the Court's order of May 31, 1984, the LOC through counsel filed a massive document in support of its motion for summary judgment.[2]

The three members of the LOC, Wilson, Jobe and Himmelright, were deposed in New York on July 17, 18 and 19 and their lengthy depositions of 199, 87 and 70 pages respectively have been filed and read by the Court.

Subsequently, on August 31, 1984, counsel for the plaintiff filed a supplemental brief in opposition to Coastal's motion for summary judgment and Coastal filed its reply memorandum on September 10, 1984. In sum, the Court's order of May 31, 1984, has been fully complied with and the matter is once again before the Court for further consideration of Coastal's motion for summary judgment based upon the recommendation of the LOC that the derivative shareholder's action be dismissed.

---

1. The oft-cited opinion in *Zapata Corp. v. Maldonado,* 430 A.2d 779 (Del.S.Ct.1981) represents a departure from the traditional view.

2. Thirty Six separate items were tendered to the Court numbering hundreds of pages. A compilation and description of the documents filed is attached to this memorandum opinion as appendix one.

A summary of the plaintiff's claim is appropriate at this point. In the plaintiff's supplemental brief filed September 1, 1984, counsel for the plaintiff outline briefly the challenged transactions as follows: [3]

On November 27, 1979 the Coastal board authorized the Company's purchase of not more than 390,000 shares of its common stock at $12 per share and the redemption of 800 shares of the Company's preferred stock at a price not to exceed its $1,000 per share par value. The purported justification for this action was averting a takeover threat by director-defendant Reid, president and a large stockholder of defendant Cascade Industries, Inc. Its subsidiary, defendant Champion Investments Inc., was the owner of 230,000 shares, approximately 20% of those outstanding, of Coastal common.

The stock purchases were authorized by votes of 4 of 9 Coastal directors: Defendants Ryder, Kelley, Reese and Siff. Defendant director Nelson and non-defendant director Daggett abstained. Non-defendant directors Henderson and Jackson voted against the purchases.

The transactions were carried out to the extent of Coastal's purchase from defendant Forty-Four Forty, Inc. (44/40) of 240,000 Coastal common shares for $2,880,000 and of 533 of its preferred shares for $533,000. When these purchases were authorized, Coastal's common, which traded over-the-counter, was quoted 5¾ bid, 6¾ asked; and the preferred (purchased at par) paid a 6% dividend against interest rates then prevailing of 12–14%.

The complaint is that these transactions served no corporate purpose and wasted the Company's assets. Allegedly the purpose was to entrench management and to benefit the late Mr. Pedler, the principal shareholder of 44/40. It appears that of the 240,000 common shares which Coastal acquired from 44/40, 230,000 were concurrently acquired by 44/40, along with all the preferred stock, from defendant Reid's Champion Investments, Inc. in a transaction which conferred significant personal benefits on Mr. Pedler. 44/40 was a mere conduit for those shares. Allegedly, the circularity of the transactions enhanced the purchase price as *quid* for the benefits incidentally and personally gained by Mr. Pedler.

The actions of the defendants Harold Ryder, Frank B. Reid and the late James S. Pedler are central to this action. Harold Ryder was the principal managing officer of Coastal and proposed to the Board the challenged transaction. The late James Pedler was a principal shareholder in the corporation Forty-Four Forty and benefited in several ways from the challenged transaction. Frank B. Reid, a member of the Board of Directors of Coastal, was an outspoken critic of Ryder's management and was viewed as a serious "takeover" threat to the existing management and control of Coastal. The execution of the challenged transaction resulted in the effective elimination of Frank B. Reid as a continuing threat to the management and control of Coastal.

The papers and documents filed by Coastal on June 11, 1984, (See appendix I) includes a substantial document entitled Factual Analysis and Report numbering 54 pages, dated November 13, 1981, and prepared by LOC's counsel. The document, unlike the final report initially filed in support of Coastal's motion for summary judgment,[4] reveals a substantial number of con-

---

**3.** In the brief filed on Sept. 10, 1984, counsel for Coastal did not challenge plaintiff's counsel's outline of plaintiff's action. In the Court's memorandum opinion of March 6, 1984, the Court mistakenly described the late James Pedler as a director of the Board of Coastal at the time the challenged transaction was approved on November 27, 1979. Pedler had been a member of the Board of Directors of Coastal previously and following the approval of the challenged transaction rejoined the Board. But Pedler did not participate in the Board approval of the challenged transaction as mistakenly suggested previously by the Court.

**4.** See Appendix I to the March 6, 1984 memorandum opinion which is the final report dated

cerns and questions raised by counsel for LOC with respect to the challenged transactions with a collective emphasis upon the roles of Harold Ryder and James Pedler in bringing about the challenged purchase of the Coastal stock.[5] Significantly the Factual Analysis reveals that the late James Pedler, who was significantly benefited by the challenged transactions, was found to be engaged in a "blatant" conflict of interest as he worked as special counsel for Coastal at Harold Ryder's direction in negotiating and arranging for the two critical transactions, i.e., the sale of a substantial block of Coastal stock from Cascade-Champion to Forty-Four Forty and then the sale from Forty-Four Forty to Coastal of the Coastal stock.[6]

As the documents of the LOC filed June 11, 1984 further indicate, the challenged transaction was brought to the attention of the Board of Directors on November 27, 1979, without any advance notice[7] and as a consequence, the members voting both for and against the proposition had little time to consider the nuances of the transaction in terms of the debt structure of Coastal. It also appears that Harold Ryder, who proposed Board approval of the challenged transaction at the November 27, 1979 meeting failed to advise the other members of the Board, with respect to the Pedler involvement (i.e. the conflict of interest) in the negotiations leading to the challenged transaction.

Counsel for the plaintiff and counsel for the LOC are in agreement that the issue before the Court at this stage of the proceedings, given the earlier pronouncements of the Court on March 6, 1984, respecting Ohio's adherence to the traditional view of the business judgment role is whether the LOC's investigation was conducted independently, in good faith, and with procedural fairness. At this point, having agreed on the issue, the parties take, as might be expected, diametrically opposed views. It is agreed that neither Wilson, Jobe, or Himmelright, the members of the LOC, had any prior connection with Coastal before their election to the Board of Directors which post-dated the approval of the challenged transaction. However, plaintiff contends that the independence of the members of the LOC was seriously compromised by the selection process leading to their election to the Board of Directors. Wilson, Jobe and Himmelright each testified that their election to the Board was preceded by an initial contact with Harold Ryder who suggested their service on the Board.[8] Additionally, there is disagreement as to the issue of whether the LOC members engaged in a procedurally fair and thorough investigation of the challenged transaction.

The recent decision of the Sixth Circuit in *Hasan v. Clevetrust Realty Investors,* 729 F.2d 372 (1984), reversing the District Court's granting of summary judgment in a shareholder's derivative action is most instructive where the issue is the independence, good faith and procedural fairness of the LOC. In *Hasan* the district court granted summary judgment based upon the recommendation of the Special Committee appointed by the trustees of the corporation in a derivative shareholder's action.[9] Counsel for Coastal takes the position that *Hasan* is not relevant to this case because at issue was application of Massachusetts law rather than Ohio law. This Court disagrees because in the Court's view the analysis in *Hasan* is equally applicable to Ohio as both states follow the traditional application of the business judgment rule

---

December 9, 1981, recommending a dismissal of plaintiff's case.

**5.** See Appendix II to this memorandum opinion for a number of judicially selected extracts from the Factual Analysis and Report of November 13, 1981.

**6.** *See* extracts numbered 2, 4, 5, 6, 9 in Appendix II.

**7.** *See* page 2 of the December 19, 1979 letter of Robert G. Henderson to the President of Coastal Industries, document 27, Appendix I.

**8.** *See* Wilson Deposition, page 17; Jobe Deposition, pages 7 and 8; and Himmelright Deposition, pages 8 and 9.

**9.** *See* 548 F.Supp. 1146 (1982).

and the Court finds no case where the Ohio courts have addressed judicial supervision of the requirement that the Litigation Oversight Committee conduct its work from an independent perspective in good faith with procedural fairness. *Cf. Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967).

The *Hasan* court declared that the evidence must be viewed in a light most favorable to the non-moving party to determine whether a genuine issue of material fact existed as to the disinterestedness of the special litigation committee. *Id.* at 374.

The foundation of the district court's opinion was based upon the legal conclusion that a presumption of good faith attached to the report and recommendation of a special litigation committee. The *Hasan* court then considered at length the "presumption to good faith" both from the standpoint of the Delaware approach as set forth in *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del.S.Ct.1981) and the more traditional approached recognized by Massachusetts and typically represented by the erudite opinion in *Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979) and concluded that both the *Zapata* and *Auerbach* approach to the business judgment rule require the Court to consider and evaluate procedurally the composition and conduct of the LOC. The *Hasan* court in rejecting the good faith presumption held:

> Under both *Auerbach* (New York law) and *Zapata* (Delaware law), then, a reviewing court must scrutinize the record to determine whether a genuine issue of material fact exists as to the committee's independence, good faith and procedural fairness. The question therefore is not whether this Court has authority to review the good faith of a special litigation committee; it does. The question before us, rather, is by what standard this Court must review the committee's possible biases.

The district court concluded that a reviewing court must accord the committee a presumption of good faith. We disagree....

The delegation of corporate power to a special committee, the members of which are hand-picked by defendant-directors, in fact, carries with it inherent structural biases....

The problems of peer pressure and group loyalty exist *a fortiori* where the members of a special litigation committee are not antagonistic, minority directors, but are carefully selected by the majority directors for their advice. Far from supporting a presumption of good faith, the pressures placed upon such a committee may be so great as to justify a presumption against independence. *See* Dent, *The Power of Directors to Terminate Shareholder Litigations: The Death of The Derivative Suit*, 75 Northwestern L.Rev. 96 (1981). In the case before us, however, we need not determine the propriety of a conclusive presumption against good faith. We do conclude, though, that the policies of the business judgment rule do not create a presumption in favor of the good faith of a special committee and that the realities of corporate life militate against any such presumption.

*Hasan* at 376–77.

In sum, *Hasan* indicates clearly and unequivocally that where genuine issues of material fact exist with respect to any of the issues of independence, good faith, or procedural fairness with respect to the LOC, summary judgment on behalf of the corporation based upon the recommendation of the LOC, is inappropriate. Thus, this Court construes *Hasan* to withdraw from the trial court the general power to enter an adjudication with respect to the question of the independence, good faith and procedural fairness of the LOC but rather narrowly focuses the inquiry of the trial court, where the work of the LOC is challenged, upon the question of whether genuine issues of material fact do or do not

exist in the context of the LOC's independence, good faith and procedural fairness.[10]

In the Court's view, the decision in *Hasan* is particularly relevant with respect to Coastal's challenged motion for summary judgment. Confronted with the question of whether Coastal is entitled to summary judgment based upon the recommendation of the LOC where the Committee's independence, good faith and procedural fairness is under attack, *Hasan* states unequivocally that where there are genuine issues of material fact with respect to any of those issues, summary judgment is inappropriate.

This Court has read carefully the materials submitted by the LOC on June 11, 1984, and as a result of the Court's prior order of May 31, 1984. It is evident that a lengthy investigation was undertaken by counsel for the LOC. It is equally evident from a reading of the Factual Analysis and Report of November 13, 1979, that many issues growing out of the complex transaction approved by split vote of the Board of Directors on November 27, 1979 exist. It is apparent that the three members of the LOC, each of whom was questioned extensively in July of 1984, steadfastly believe that the action should be dismissed for the reason that the four members of the Board of Directors who voted to approve the challenged transaction, taking into consideration the facts and circumstances known to them, exercised sound business judgment even though others considering the same information might have come to a contrary conclusion such as the dissenting directors, Henderson and Jackson.

 However, it is also equally apparent to the Court that each of the three members of the Committee, given the informa-

tion contained in the Factual Analysis and Report, knew or should have known that the questionable conduct was limited primarily to Ryder and Pedler and the action between the two of them. However, it is apparent from a reading of the July 1984 depositions of the three members of the LOC, that each member of the LOC had great difficulty in explaining how and by what means it was determined that there was no disabling taint connected with the challenged transaction by virtue of the relationship between Pedler and Ryder against the background of the "blatant conflict of interest," as described in the Factual Report and Analysis of November 13, 1979.[11] Beginning with the clear direction of *Hasan* with respect to the use of summary judgment in this type of proceeding, and given the recruitment by Ryder of the three members of the LOC to serve on the Board of Directors, and given the brief six day period of time between the issuance of the Factual Report and Analysis on November 13, 1981, and the final determination of the LOC on November 19, 1981, to direct counsel to file a motion to dismiss or for summary judgment, and given the inability of the three members of the LOC to articulate how they were able to arrive at their judgment given the taint issue, this Court concludes that genuine issues of material fact exist with respect to the independence and the thoroughness of the LOC's work which precludes granting Coastal's motion for summary judgment.

Coastal's motion for reconsideration of the denial of the motion for summary judgment having been granted and considered,

---

**10.** *Hasan* does not address the issue of what becomes of the recommendation of the LOC in the event the trial court concludes that summary judgment is inappropriate. The question that occurs to the Court is whether the recommendation of the LOC is admissible at trial as some evidence to be considered by the trier of fact. By way of comparison, albeit conceivably strained, the Court notes that in a medical malpractice action in Ohio, under the provisions of Chapter RC 2711, and in particular RC 2711.21, the action of the arbitration board where rejected by a party to the litigation, may be submitted for the jury's consideration. Additionally, un-

der certain circumstances, one or more of the arbitrators may be called to testify. *See* RC 2711.21(D). The Court raises this issue because in the Court's view, the thrust of *Hasan* is to severely limit the use of the recommendation of the Litigation Oversight Committee in a derivative shareholders action.

**11.** *See* the Wilson deposition, pages 78–94 and 142–145; the Jobe deposition, pages 42–64; and the Himmelright deposition, pages 23–26 and 36–37.

Coastal's motion for summary judgment is again overruled.

IT IS SO ORDERED.

## APPENDIX I

| DOCUMENT DESCRIPTION | NO. OF PAGES |
|---|---|
| 1 "Factual Analysis and Report" dated November 13, 1981 | 54 |
| 2 Minutes of Meeting of Litigation Oversight Committee, January 21, 1981 dated March 11, 1981 | 3 |
| 3 Minutes of Meeting of Litigation Oversight Committee, March 12, 1981, March 13, 1981 | 2 |
| 4 Minutes of Meeting of Litigation Oversight Committee, March 31, 1981 | 1 |
| 5 Minutes of Meeting of Litigation Oversight Committee, June 4, 1981 | 2 |
| 6 Minutes of Meeting of Litigation Oversight Committee, June 26, 1981 (Meeting with pltf's counsel and recitation of counsel's position) | 5 |
| 7 Minutes of Meeting of Litigation Oversight Committee, September 2, 1981 | 1 |
| 8 Minutes of Meeting of Litigation Oversight Committee, September 8, 1981 (Pedler interview) | 7 |
| 9 Minutes of Meeting of Litigation Oversight Committee, September 11, 1981 (Ryder interview) | 6 |
| 10 Minutes of Meeting of Litigation Oversight Committee, September 17, 1981 (Reid interview) | 11 |
| 11 Minutes of Meeting of Litigation Oversight Committee, October 2, 1981 (General review) | 2 |
| 12 Minutes of Meeting of Litigation Oversight Committee, November 19, 1981 (Wilson conclusions) | 1 |
| 13 Minutes of Meeting of Litigation Oversight Committee, November 19, 1981 (Jobe & Himmelright agree, instructions to Guster) | 1 |
| 14 Memorandum Summary of Interview with Howard W. Ryder (revised May 22, 1981) | 23 |
| 15 Memorandum of Comments of Howard W. Ryder regarding Memorandum Summary of Interview with Litigation Oversight Committee | 7 |
| 16 Memorandum Summary of Interview with Howard W. Ryder (First Draft, with Notations) | 23 |
| 17 June 2, 1981, Letter of Hugh M. Stanley to Richard E. Guster and Thomas M. Parker | 8 |
| 18 Completed Questionnaire of C. A. Kelley | 14 |
| 19 Completed Questionnaire of M. T. Jackson | 3 |
| 20 Completed Questionnaire of R. B. Nelson | 14 |
| 21 Completed Questionnaire of J. S. Pedler, Jr. | 25 |
| 22 Completed Questionnaire of L. J. Reese | 3 |
| 22 Completed Questionnaire of H. W. Ryder | 14 |
| 23 Completed Questionnaire of F. B. Reid | 12 |
| 24 Completed Questionnaire of A. L. Siff | 13 |
| 25 Fee Statements of James S. Pedler, Jr., January 2, 1981 and May 15, 1980 | 6 |
| 26 February 17, 1981, Letter from Ira K. Gross, Counsel for R. H. Henderson (Declining to answer questionnaire) | 2 |
| 27 December 19, 1979, Letter from R. H. Henderson to President, Coastal Industries, Inc. (Letter highly critical of 11–27–79 action) | 4 |

| DOCUMENT DESCRIPTION | NO. OF PAGES |
|---|---|
| 28 August 16, 1981, Letter from Ira K. Gross, Counsel for R. H. Henderson, to T. M. Parker (with copy of list of documents forwarded to plaintiff's counsel) | 5 |
| 29 October 1, 1981, Letter from T. M. Parker to Ira K. Gross, Counsel for R. H. Henderson | 2 |
| 30 October 1, 1981, Letter from T. M. Parker to J. C. Fairweather (In re: Ernst & Whitney study) | 2 |
| 31 Octobr 5, 1981, Letter from F. E. Quirk to T. M. Parker (indicating no Ernst & Whitney study exists) | 1 |
| 32 October 9, 1981, Letter from J. C. Fairweather to T. M. Parker. (Explanation of Pedler's answers to question 21(c) on questionnaire) | 1 |
| 33 October 19, 1981, Letter from R. B. Block to T. M. Parker (In re: appraisal value) | 2 |
| 34 August 28, 1981, Letter from C. B. Saviers (paralegal) to members of Litigation Oversight Committee (Package prepared for Sept. 2, 1981 meeting of LOC) | 77 |
| 35 Series of Five Typed Pages Reflecting Board of Directors Memberships in 1969, 1974, 1976, 1978 and 1979; and | 5 |
| 36 October 2, 1981, Letter from B. M. Eisenberg with attachments: Documents produced as a result of interview of F. B. Reid | 100+ |

## APPENDIX II

SELECTED EXTRACTS FROM THE NOVEMBER 13, 1981 FACTUAL ANALYSIS AND REPORT PREPARED BY COUNSEL FOR THE LITIGATION OVERSIGHT COMMITTEE KEYED TO PLAINTIFF'S AMENDED COMPLAINT, PARAGRAPHS 15 THROUGH 29 WITH ADDITIONAL FACT MATTERS DISCUSSED.

1. At page 14.

"The essence of the case and the questions to be addressed by the Committee must be (i) the propriety of the actions of Messrs. Ryder, Pedler and Reid in negotiating and completing the transactions whereby Coastal stock was transferred from Champion to 4440 and 4440 to Coastal, (ii) the use or misuse of Coastal funds to effect transactions intended to satisfy personal motivations, and (iii) the funds of Coastal involved and the overall financial impacts of the transactions."

2. At page 19–20.

"Plaintiff has also attempted to make the argument that James Pedler violated a fiduciary duty to Coastal through his actions in negotiating and executing the transactions. As indicated above, Mr. Pedler was not a member of the Coastal board of directors when the transactions between Coastal and 4440 were authorized. Plaintiff would attempt to circumvent that fact in order to create a fiduciary duty by arguing that Pedler was nominated for election to the board at the November 27, 1979, directors meeting, thereby creating a duty from that point forward. Such an argument assumes a critical fact in order to reach the desired conclusion—that Pedler would be elected. We are unaware of any principle which imposes a fiduciary duty upon one who is not actually an officer, director or majority shareholder of a corporation. Pedler was none of the above at the time of the transaction. Interestingly, however, Pedler did serve Coastal as special counsel in the negotiations between Champion and 4440 and in performing legal services in connection with the completion of the transaction between 4440 and Coastal. Pedler was paid a total of $25,000.00 in legal fees for his performance of his role as "special counsel." While it is apparent that his actions as special counsel presented a blatant conflict of interest for Mr. Pe-

dler, it does not appear that a director's fiduciary duty was violated thereby. Pedler may well have violated duties arising from his obligation to his clients as an attorney. Further attention will be given to the subject of Mr. Pedler's role as special counsel later in this memorandum."

3. At Page 20.

"Only by making allegations that the directors (¶ 18, Ryder, Reese, Siff and Kelley; ¶ 19, Reid and future director Pedler) were engaged in self-dealing activities can plaintiff impose the obligations upon the individuals involved to demonstrate that the transactions were "fair" to Coastal in an objective sense. Otherwise, the directors could fend off any attacks on the propriety of the transactions by simply invoking the business judgment rule (which prevents courts or shareholders from second-guessing corporate activities absent fraud, bad faith or self-dealing)."

4. At Page 20.

"There are certain critical subjects, however, which should be carefully scrutinized by the Committee. Of particular importance are Mr. Ryder's motivations in proposing and carrying out Coastal's repurchase of shares from 4440, Mr. Reid's knowledge and motivations in carrying out his end of the transaction during a period when he was a member of the Coastal board, and Mr. Pedler's conduct, particularly in his role as "special counsel" during the period."

5. At page 29.

"While plaintiff's grand scheme allegations appear to be overly broad with respect to all defendants, it does appear that Messrs. Ryder and Pedler remained in close contact with one another during the period of the negotiations between Pedler and Reid."

6. At page 30–31.

"At a later point in the negotiations, Pedler apparently advised Ryder of the price then being discussed for a Champion sale to 4440 and asked what price Coastal could pay for its stock. (*See* Minutes of Meeting of L.O.C., 9/8/81, Interview of James S. Pedler, Jr., p. 5.) Ryder's reply, that he did not think Coastal could go above $11.00 per share, indicates either (i) that the 4440–Champion deal was part of a plan which had the ultimate goal of having Coastal acquire Champion's Coastal stock through 4440, or (ii) that Ryder and Pedler had already reached an agreement in principle that Coastal would acquire its shares from 4440 in the event of a 4440 purchase from Champion. The first scenario meshes with the allegations made by plaintiff, while the second seems to fit with the versions related by Ryder and Pedler."

7. At page 46–47.

"Again, as with the Stone & Webster appraisal update, a discrepancy between the stories told by Mr. Ryder and others appears. It is impossible to determine whether the difference of opinion is the result of a failure of communication regarding each other's position by Messrs. Reid and Ryder or because of some desire of Ryder to bring Pedler into the transaction to confer financial benefits upon him. In either case, it appears that the financial burden on Coastal would have been the same, assuming that a $12.00 per share price had been negotiated by Coastal and Champion. As with other statements of Mr. Reid discussed above, it may be that his position of absolute willingness to deal with Coastal has been tailored to suit his position in this lawsuit. The Committee will have to determine the credibility of the various individuals in assessing the positions each has taken."

8. At page 48.

"As noted above, it appears unlikely that any significant financial difference would have occurred had Coastal been able to deal directly with Champion. The fact that Pedler received financial benefits is important but should be balanced by the fact that he was not officially connected with Coastal at that time, except in his

role as "special counsel." Other than possible problems with Pedler, therefore, it does not appear that the issue of 4440's role as agent is of great significance."

9. At page 50–52.

"This issue presents perhaps the most difficult question for the Committee to analyze. At some point during the course of the negotiations which led to the transactions challenged by plaintiff, Howard Ryder, on behalf of Coastal, retained James Pedler to act as special counsel on Coastal's behalf. Perhaps the best indication of the services performed by Pedler on behalf of Coastal can be derived from an examination of the statements directed by Pedler to Coastal:

Partial billing for services rendered as special counsel to Coastal Industries, Inc., in connection with (1) the negotiations with Cascade/Champion for the purchase of 230,000 shares of Common Stock and 800 shares of Preferred Stock of Coastal Industries, Inc., by 4440, Inc., and (2) the services performed in connection with the agreement between 4440, Inc. and Coastal Industries, Inc., in connection with the purchase from 4440, Inc., of 240,000 shares of Common Stock of Coastal Industries, Inc., by Coastal Industries, Inc. which services included among other matters attending numerous meetings with executive management of Coastal Industries, Company's Cleveland and Akron counsel and the development of various alternatives with respect to the acquisition of such.

From the statement, it appears that Pedler was acting as Coastal's agent in the advancement of the 4440–Champion discussions as well as in the progression of events leading up to the 4440–Coastal agreement. Since the statement makes no reference to the dates upon which services were rendered, it is impossible to determine when Pedler began acting as special counsel to Coastal. It does not appear that Mr. Ryder formally consulted with the board of directors regarding the hiring of Pedler since no mention of his retention or authorization of Ryder to effect the same appears in the minutes of Coastal's board meetings. Pedler was paid a total of $25,000.00 for his services in two installments. Curiously, the first statement was rendered on May 15, 1980, by Brouse & McDowell, for whom Pedler was listed as of counsel at that time. The second statement was submitted on January 2, 1981. Both statements were presented *after* the commencement of the *Holmstrom* litigation.

The employment of Pedler as Coastal's attorney during the period of the 1979 negotiations lends much credence to the plaintiff's theory that a scheme was being perpetrated and that Coastal was, in actuality, dealing directly with Champion but did so through 4440 in order to confer a benefit upon Pedler. It is difficult to understand the basis for the payment of legal fees to Pedler by Coastal when he was most likely acting for his and 4440's own benefit. It does appear that he refrained from signing an option agreement with Champion on behalf of 4440 at the behest of Coastal; perhaps from that point forward he acted as Coastal's attorney/agent in moving the negotiations toward their ultimate resolution. It is most difficult to justify Coastal's payment of legal fees to Pedler for the Coastal–4440 transaction when Pedler was so plainly associated with 4440, and acting in 4440's interest. Even if Pedler was responsible for the drafting of documents used in the 4440–Coastal deal, he did so on behalf of 4440. A more obvious conflict of interest situation would be difficult to conceive."

10. At page 53–54.

"Plaintiff has challenged the validity of the transactions through which Coastal acquired its common and preferred shares from 4440. In order to overcome the usual protections afforded director decisions by the business judgment rule, plaintiff must demonstrate fraud, bad faith or self-dealing on the part of the directors who approved the transaction.

In this instance, the directors voting in favor of the challenged transaction were Ryder, Reese, Siff and Kelley. Messrs. Reese, Siff and Kelley apparently had no financial self-interest at stake in the decision to vote for or against the transactions, other than nominal (at that time) directors' fees. Howard Ryder did have substantial financial interests at stake in the event of a Reid takeover. The Committee must decide whether Mr. Ryder's personal interests took precedence over his allegiance to the best interests of Coastal. If his motivations were properly directed toward Coastal's best interest, the fact that his own interests were served does not undermine the propriety of his action; no director must vote against corporate resolutions which also serve self-interests simply to keep the vote from being tainted. Ryder received no financial benefits from the transaction and, even if he had voted against the resolution, thereby permitting a Reid takeover and leading to his separation from the company, he presumably would have obtained suitable employment elsewhere at a comparable salary. Measuring Ryder's potential loss, therefore, could only be the subject of speculation.

If the Committee finds no bad faith or self-dealing motivations on the part of Ryder, Reese, Siff and Kelley, then the wisdom of the transactions need not be considered and plaintiff's claims should be rejected. If it is found that there was an improper element of self-interest in Ryder's actions, then the Committee should examine the wisdom and fairness of the directors' actions to Coastal."

## ON MOTION TO WITHDRAW JURY DEMAND

Plaintiff Peter G. Holmstrom brings this shareholder's derivative action against a number of the directors of the defendant Coastal Industries on behalf of the company. A summary of the factual and procedural history of this case may be found in the Court's Memorandum Opinion filed March 6, 1984. Before the Court is the motion of the plaintiff to withdraw his de-

mand for a jury trial and to strike defendants' demand for the same. Defendant opposes plaintiff's motion. For the reasons which follow, plaintiff's motion is denied.

## I. MOTION OF PLAINTIFF TO WITHDRAW JURY DEMAND AND STRIKE DEFENDANTS' DEMAND THEREFOR

The basis for plaintiff's motion is that plaintiff's cause of action for breach of fiduciary duty is equitable in nature and therefore not triable by a jury. Plaintiff argues in his complaint that "[t]he director-defendants are charged as faithless and delinquent fiduciaries; and the non-director-defendants ... are charged as collaborators with faithless fiduciaries ... in their breaches of trust." Plaintiff's memorandum in support of his motion, p. 7. Plaintiff argues that such claims are misconduct have long been regarded as equitable in nature. Plaintiff argues that the nature of the issue to be tried determines whether or not his case should be tried to a jury, and not the fact that he seeks money damages for defendants' alleged wrongful conduct. Plaintiff argues that the fact that he seeks money damages does not change the basic nature of his claims.

In opposition, defendants argue that looking at substance over form, plaintiff's claims "for breach of fiduciary duty are grounded in gross negligence or other improper conduct despite the fact that other causes of action were not specifically pled." Defendant's memorandum in opposition to plaintiff's motion, p. 3. Defendants argue that traditionally such issues have been triable to a jury. Defendants further argue that the remedy plaintiff seeks is not equitable relief, but damages. Lastly, defendant argues that this case is not complicated, and falls within the practical abilities of juries.

## A. DISCUSSION AND LAW.

The seventh amendment to the United States Constitution preserves the right to a trial by jury in "[s]uits at common law,

where the value in controversy shall exceed twenty dollars." The question of whether the seventh amendment guarantees the right to a jury trial in stockholders' derivative actions was decided by the United States Supreme Court in the landmark case of *Ross v. Bernhard*, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). In *Ross*, the Supreme Court held that "the right to a jury trial attaches to those issues in derivative actions as to which the corporation, if it had been suing in its own right, would have been entitled to a jury." *Id.* at 532–533, 90 S.Ct. at 735. The Court recognized that the seventh amendment preserves to litigants the rights to jury trials in suits which, at common law, would have been recognized as suits to determine legal rights, in contradistinction to suits in which the recognition of equitable rights alone, and the award of equitable remedies, were sought. However, stated the Court:

> where equitable and legal claims are joined in the same action, there is a right to jury trial on the legal claims which must not be infringed either by trying the legal issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims. The Seventh Amendment question depends on the nature of the issues to be tried rather than the character of the overall action.

*Id.* at 538, 90 S.Ct. at 738 (footnote omitted).

The Court explained the application of these principles to derivative actions as follows:

> [T]he derivative suit has dual aspects: first, the stockholder's right to sue on behalf of the corporation, historically an equitable matter; second, the claim of the corporation against directors or third parties on which, if the corporation had

sued and the claim presented legal issues, the company could demand a jury trial. As implied by Mr. Justice Holmes in *Fleitmann*, [240 U.S. 27, 36 S.Ct. 233, 60 L.Ed. 505] legal claims are not magically converted into equitable issues by their presentation to a court of equity in a derivative suit. The claim pressed by the stockholder against directors or third parties "is not his own but the corporation's." *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 522 [67 S.Ct. 828, 831, 91 L.Ed. 1067] (1947). The corporation is a necessary party to the action; without it the case cannot proceed. Although named a defendant, it is the real party in interest, the stockholder being at best the nominal plaintiff. The proceeds of the action belong to the corporation and it is bound by the result of the suit. The heart of the action is the corporate claim. If it presents a legal issue, one entitling the corporation to a jury trial under the Seventh Amendment, the right to a jury is not forfeited merely because the stockholder's right to sue must first be adjudicated as an equitable issue trial be to the court.

*Id.* at 538–539, 90 S.Ct. at 738. Hence, the Court stated:

> The historical rule preventing a court of law from entertaining a shareholder's suit on behalf of the corporation is obsolete; it is no longer tenable for a district court, administering both law and equity in the same action, to deny legal remedies to a corporation, merely because the corporation's spokesmen are its shareholders rather than its directors.

*Id.* at 540,[1] 90 S.Ct. at 739.

In *Ross*, the Supreme Court set out the following three considerations to be made in determining whether an issue is "legal" in nature:

---

1. As to the case before it, the Court concluded that:

 > In the instant case we have no doubt that the corporation's claim is, at least in part, a legal one. The relief sought is money damages. There are allegations in the complaint of a breach of fiduciary duty, but there are also allegations of ordinary breach of contract

and gross negligence. The corporation, had it sued on its own behalf, would have been entitled to a jury's determination, at a minimum, of its damages against its broker under the brokerage contract and of its rights against its own directors because of their negligence.

*Id.* at 542, 90 S.Ct. at 740.

[F]irst, the pre-merger custom with reference to such questions; second, the remedy sought; and, third, the practical abilities and limitations of juries. Of these factors, the first, requiring extensive and possibly abstruse historical inquiry, is obviously the most difficult to apply.

*Id.* at 538 n. 10, 90 S.Ct. at 738 n. 10.

■ Addressing the first consideration set forth by the Supreme Court in *Ross*, this Court finds that while plaintiff's complaint against the defendants is pled in terms of an alleged breach of fiduciary duty, plaintiff's complaint is grounded in negligence, and would, if asserted by the defendant corporation prior to the merger of law and equity, be cognizable in a suit at common law. Specifically, the Court's review of plaintiff's complaint leads the Court to conclude that plaintiff seeks damages for alleged conduct on the part of the defendants which, albeit not expressly characterized by the plaintiff as such, amounts to gross negligence in redeeming the stock in question. *See DePinto v. Provident Security Life Insurance Co.,* 323 F.2d 826, 836–837 (9th Cir.1963), *cert. denied sub nom. Gorsuch v. DePinto,* 376 U.S. 950, 84 S.Ct. 965, 11 L.Ed.2d 969 (1964), in which the Court found that plaintiffs' claims against the defendants for breach of their fiduciary duties, irrespective of separate claims for negligence, "actually rest[ed] upon a finding of gross negligence." In *DePinto,* the Court held that "where a claim of breach of fiduciary duty is predicated upon underlying conduct, such as negligence, which is actionable in a direct suit at common law, the issue of whether there has been such a breach is, subject to appropriate instructions, a jury question." *Id. See also Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 477–478, 82 S.Ct. 894, 900, 8 L.Ed.2d 44 (1962) ("[T]he constitutional right to trial by jury cannot be made to depend upon the choice of words used in the pleadings.").

The cases cited to the Court by the plaintiff, *see In re Evangelist,* 760 F.2d 27 (1st Cir.1985) and *In re Gartenberg,* 636 F.2d 16 (2d Cir.1980), *cert. denied,* 451 U.S. 910, 101 S.Ct. 1979, 68 L.Ed.2d 298 (1981), as examples of cases in which jury trials have been denied in derivative actions for breach of fiduciary duty are inapposite to the case at bar. Both cases involved a specific federal statute which allowed only restitutionary damages and was enacted to create an equitable cause of action. No such statute is involved in the case at bar.

The second consideration raised by the Supreme Court in *Ross, supra,* the remedy sought, has been held by the United States Court of Appeals for the Sixth Circuit to be "the chief focus to be made when determining whether a jury trial right exists...." *Hildebrand v. Board of Trustees of Michigan State University,* 607 F.2d 705, 708 (6th Cir.1979). In *Hildebrand,* the Court stated that "[i]f the remedy sought is injunctive relief and/or back pay, no jury trial right attaches. In the ordinary case, if the relief sought includes compensatory and/or punitive damages, then there does exist a right to trial by jury." *Id.*

In the case at bar, plaintiff demands "[t]hat the defendants other than Coastal pay over to Coastal the damages which they have inflicted upon Coastal and the profits which they have gained through their [alleged] misconduct ...," as well as costs, expenses including reasonable attorney fees, and any other relief this Court deems appropriate. Plaintiffs do not request relief which is traditionally regarded as equitable in nature, such as a preliminary injunction. The nature of the relief demanded by plaintiff thus creates a right to trial by jury.

Plaintiff cites two cases to the Court for the proposition that a claim for monetary relief does not make a claim which is essentially equitable in nature unsuitable for trial by jury. *See Morelock v. NCR Corp.,* 546 F.2d 682 (6th Cir.1976) and *Maldonado v. Flynn,* 477 F.Supp. 1007 (S.D.N.Y.1979). However, as noted by authority cited *supra* in the Court's analysis of the first consideration to be made under *Ross,* the converse is also true. That is, where a complaint sounds in an action that is eq-

uitable in nature but damages are sought, the action is suitable for trial by jury. *See DePinto v. Provident Security Life Insurance Co., supra. See also Dairy Queen, Inc. v. Wood, supra* (complaint requesting a money judgment presented a legal claim, notwithstanding fact that it was cast in terms of an "accounting"); *In re N–500L Cases,* 691 F.2d 15, 21 (1st Cir.1982) ("underlying issues of negligence liability and damages are legal in nature and entitled appellants to a jury trial of the contribution claims").

As to the third and last consideration set out by the Supreme Court in *Ross, supra,* the practical abilities and limitations of juries, the Court finds, from its own experience with the abilities and limitations of juries, that this action is not so complex and entangled to make it beyond the understanding and capabilities of a jury.

The Court's analysis and evaluations of the considerations raised by the Supreme Court in the *Ross* case, *supra,* lead the Court to conclude that the basis of plaintiff's claims is "legal" in nature. Further, recognizing the difficulty of the question raised by plaintiff's motion, the Court notes that "there is a clear federal policy in light of the Seventh Amendment favoring jury trials and in doubtful cases jury trials should be favored." *Jefferson National Bank v. Central National Bank,* 700 F.2d 1143, 1150 (7th Cir.1983). *See also Dixon v. Northwestern National Bank,* 297 F.Supp. 485, 489 (D.Minn.1969) ("In close cases where there is doubt, it is the court's reading of the teachings in *Dairy Queen, Inc. supra* and other cases that the court should favor of [sic] the granting of a jury trial to insure constitutional rights.") Plaintiff's motion is accordingly denied.

IT IS SO ORDERED.